In re Pearl MAXWELL, Debtor.

Pearl Maxwell, Plaintiff,

v.

Fairbanks Capital Corporation,
Defendant.

Bankruptcy No. 00–14283–JNF.
Adversary No. 00–1568.

United States Bankruptcy Court,
D. Massachusetts.

July 16, 2002.

Tara Twomey, Jamaica Plain, MA, for debtor.

Shiva Karimi, Boston, MA, for Fairbanks Capital Corp.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

The matters before the Court are the Motion for Partial Summary Judgment filed by the Plaintiff, Pearl Maxwell ("Maxwell" or the "Debtor"); and the Opposition to Debtor's Motion for Partial Summary Judgment and Cross–Motion for Summary Judgment filed by the Defendant, Fairbanks Capital Corporation ("Fairbanks"). The Court heard the Motion for Partial Summary Judgment and the Opposition and Cross–Motion on May 9, 2002 and took the matters under advisement. The Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

The Debtor filed an adversary complaint against Fairbanks on November 29, 2000. The Debtor formulated nine counts in her Complaint as follows: Count A: Violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692o (West 1998) ("FDCPA"); Count B: Violation of the Truth in Lending Act, 15 U.S.C. §§ 1601–1667e (West 1998)("TILA"); Count C: Violation of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601–2617 (West 2002) ("RESPA"); Count D: Violation of the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws Ann. Ch. 140D, §§ 1–34 (West 1991 & Supp.2001)("MCCCDA"); Count E: Violation of Mass Gen. Laws Ch. 183, § 60 (West 1991 & Supp.2001); Count F: Violation of Mass. Gen. Laws Ch. 183, § 63 (West 1991 & Supp.2001); Count G: Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A, §§ 1–11 (West 1997)("Chapter 93A"); Count H: Unconscionability; and Count I: Breach of Contract. In moving for Partial Summary Judgment, the Debtor sought judgment only with respect to Counts A, C, D, and H.

Specifically, in her Motion for Partial Summary Judgment, the Debtor stated that she is entitled to judgment on Count A as a result of Fairbanks's conduct in "demanding payments due that were in fact not due at the time of the demand and by attempting to collect monies which are not expressly authorized by the agreement or law;" that she is entitled to judgment on Count C because of Fairbanks's conduct in "failing to respond to two qualified written requests for information;" that she is entitled to judgment on Count D because she "was not provided a Truth In Lending Statement or Notice of her Right of Rescission at the time of the loan;" and that she is entitled to judgment on Count H because "the terms of the mortgage loan in this circumstance, where the monthly payment nearly equaled the borrowers [sic] total monthly income and the balloon payment exceeded the original principal balance, are so unfair and oppressive as to be unconscionable."

Fairbanks, in its Opposition, contended that Maxwell is not entitled to partial summary judgment because it is not subject to the FDCPA, stating it is not a "debt collector," or, in the alternative, that "its actions fall within the 'bona-fide error' exception;" that it is not subject to RESPA because the Debtor did not make a "qualified written request," and, in the alternative, if there were a qualified written request, the Debtor failed to show a pattern and prac-

tice of non-compliance with RESPA's provisions; that the Debtor is not entitled to rescission under MCCCDA because there is evidence that the required disclosures were made; and, finally, that it is entitled to judgment on Count H because "none of the Maxwell loans are unconscionable."

The Debtor submitted a Statement of Undisputed Facts with her Motion for Partial Summary Judgment supported by references to the record developed in this proceeding. Fairbanks did not submit a separate Statement with its Cross Motion. The issues presented include whether Fairbanks has a bona-fide error defense under the FDCPA, and whether the Debtor is entitled to rescind the agreement pursuant to which she executed the Note and Mortgage at issue in this proceeding because the payment terms were unconscionable and because Fairbanks can not produce evidence that Truth in Lending disclosures were made to the Debtor. For the reasons set forth below, the Court grants the Debtor's Motion for Summary Judgment, overrules Fairbanks's Opposition and denies its Cross–Motion for Summary Judgment.

## II. PROCEDURAL BACKGROUND

On June 22, 2000, the Debtor filed a Chapter 13 petition. The Debtor previously had filed a Chapter 13 petition on December 7, 1999. Approximately three and one-half months later, on March 24, 2000, the Court dismissed the Debtor's prior Chapter 13 case because the Debtor, who had been granted permission to pay the filing fee in installments, failed to pay the balance of the filing fee. *See* 11 U.S.C. § 707(a)(2); Fed. R. Bankr.P. 1006(b).

In the Debtor's prior Chapter 13 case, the Court, on March 1, 2000, granted Fair-

banks relief from the automatic stay because neither the Debtor nor any party in interest filed an objection to the motion. In the instant case, Fairbanks filed a Motion for Relief from the Automatic Stay on June 30, 2000. The Debtor timely filed an objection, and the Court conducted a number of hearings. On November 30, 2000 the Debtor filed an Assented to Motion to Consolidate Debtor's Complaint and Motion to Lift Stay Filed by Fairbanks Capital. The Court granted the Motion to Consolidate on December 5, 2000.

In the instant adversary proceeding, Fairbanks failed to raise a statute of limitations defense in its Answer. On December 13, 2001, it filed a Motion to Dismiss with respect to Counts B through H of the Debtor's Complaint on grounds that those counts are time barred by applicable statutes of limitation. On December 17, 2001, Fairbanks also filed a Renewed Motion to Amend Answer together with a Proposed Answer and a Demand for a Jury Trial in which it again attempted to raise applicable statutes of limitation as defenses to the Debtor's claims. The Debtor filed oppositions to Fairbanks's motions.

At a hearing conducted on January 30, 2002, this Court denied the Renewed Motion to Amend Answer but granted Fairbanks's Motion to Dismiss in part. The Court dismissed Count B with respect to the Debtor's TILA claim, citing *Beach v. Ocwen Fed. Bank,* 523 U.S. 410, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998). The Court, however, determined that even if applicable statutes of limitation precluded any affirmative recoveries by the Debtor because of expired statutes of limitation, her recoupment claims, if any, are preserved by Mass. Gen. Laws Ch. 260, § 36 (West 1992).[1] One day after the January 30,

---

1. Section 36 provides in pertinent part the following:

The provisions of law relative to limitations of actions shall apply to a counterclaim by

2002 hearing, the Court ordered the completion of discovery by March 29, 2002.

## III. FACTS

The Debtor is an 83 year old woman with minimal schooling and limited financial resources. Fairbanks is a corporation organized and existing under the laws of Utah. According to the individual designated by Fairbanks to appear for a deposition pursuant to Fed.R.Civ.P. 30(b)(6), Vince Brando ("Brando"),[2] Fairbanks's principal business is servicing residential mortgage loans, and it specializes in sub- and non-performing loans. Fairbanks buys loans in bulk without checking to ascertain whether each loan is accompanied by proper documentation.

Fairbanks claims to be the holder of a Note dated February 12, 1991 given by the Debtor and her granddaughter, Maritza Ranger ("Ranger"), to Aetna Finance Company d/b/a ITT Financial Services ("ITT"), in the original principal amount of $149,150.50, secured by a mortgage on the Debtor's property located at 49 Stockton Street, Dorchester, Massachusetts. Fairbanks, however, cannot produce the Note and, from the existing record, discussed below, it is unclear whether it ever possessed the Note or whether it has lost, misplaced or misfiled the Note.

Brando testified at his deposition that Fairbanks paid $129,344 for the Debtor's loan. He admitted, however, that Fairbanks at one point claimed to have paid $175,955 for the Debtor's loan. Indicating that the correct payment amount was $129,344, Brando added that Fairbanks paid 86.2 cents on the dollar for the loan. Later in his deposition, Brando indicated that Fairbanks has no documents in its possession to substantiate payment of that amount, and Fairbanks cannot identify any account, fund or other source of monies from which that amount was paid. Moreover, Fairbanks, through Brando, admitted that it is a debt collector under the FDCPA. It also represented itself as such in correspondence with the Debtor.

The circumstances surrounding the Debtor's execution of the Note and Mortgage to ITT are set forth both in the Debtor's Complaint and in the Statement of Undisputed Facts (the "Statement"). Fairbanks's stated in its Answer that it could neither admit nor deny these facts. These background facts are undisputed.

In the winter or early spring of 1988, Maxwell and Ranger were approached by a door-to-door salesman who suggested a variety of home repairs to the Debtor's home, including replacement of siding and installation of new windows. The salesman referred Maxwell and Ranger to ITT to enable them to finance the repairs and to consolidate other outstanding loans. On April 13, 1988, Maxwell and Ranger consolidated their existing debts, which included two mortgages, one in the sum of $24,683.87 to Connecticut National Bank

---

the defendant. The time of such limitation shall be computed as if an action had been commenced therefor at the time the plaintiff's action was commenced.

Notwithstanding the provisions of the first paragraph of this section, a counterclaim arising out of the same transaction or occurrence that is the subject matter of the plaintiff's claim, to the extent of the plaintiff's claim, may be asserted without regard to the provisions of law relative to limitations of actions.

Mass. Gen. Laws Ann. Ch. 260, § 36 (West 1992).

**2.** The Debtor, in the record attached to her Statement of Undisputed Facts, did not identify the witness that her counsel deposed. Fairbanks referred to the deposition testimony of Brando. Accordingly, the Court shall assume that the deposition testimony made part of the Debtor's Statement of Undisputed Facts was Brando's.

and the other in the sum of $76,596.86 to First American Services, and funded the home repairs by borrowing $137,611.01 from ITT. The 1988 ITT loan was secured by a first mortgage on the Debtor's Stockton Street property. The term of the loan was 15 years with an Annual Percentage Rate ("APR") of 16.78%. The monthly payment was $1,908. Additionally, the prepaid finance charge was $12,384, almost 10% of the amount financed. The Debtor paid additional fees for recording the mortgage ($102.50), to an attorney ($700), to "Lenders Service" ($275), and for title insurance ($266.30).

At the loan closing, Vinyl Distributors was paid $22,602.08 for the repairs to the Debtor's home, although Ranger, in an affidavit, indicated that the payment to Vinyl Distributors was made before the work was completed. Moreover, although it had been paid from the loan proceeds, Vinyl Distributors, according to Ranger, never finished the repairs.

On February 12, 1991, ITT refinanced the 1988 loan with a second loan in the principal amount of $149,150.50. The Mortgage executed by Maxwell and Ranger sets forth that amount, as well as a five year term and a 16% APR. In her Complaint, the Debtor alleged, upon information and belief, the following: 1) that the second ITT loan required a regular monthly mortgage payment of approximately $2,005.00; 2) that the second ITT loan was negatively amortized, "meaning that the monthly payment of $2,005.00 was insufficient to pay the interest accruing on the account;" 3) that she would have been required to make a final balloon payment at the end of the term of the loan in a sum greater than the original amount of the loan; 4) that, at the time the loan was consummated, ITT did not provide her with the required TILA and MCCCDA disclosures; 5) that she was not informed

that a balloon payment was required; 6) that, at the time of the second ITT loan, her annual income was approximately $4,000 and Ranger's annual income was approximately $22,000; 7) that the annual mortgage payments under the loan would almost equal her income combined with Ranger's income; 8) that in 1993 she and ITT agreed to reduce the payments under the note to $800.00 per month; 9) that ITT did not inform her that the reduced payment would result in further negative amortization and increase the amount of the balloon payment; 10) that ITT assigned the Note and Mortgage to Transamerica Financial Services ("Transamerica"); 11) that after the loan matured, Transamerica did not renew or extend the note pursuant to Mass. Gen. Laws Ch. 183, § 60, although it continued to accept payments in amounts ranging from $200.00 to $3,062.55; and 12) that all payments made by Transamerica were not credited to the Debtor's account.

In its Answer, in response to the Debtor's allegations set forth in paragraphs 18–26 of her Complaint, paraphrased above, Fairbanks indicated that those paragraphs did not refer to it and that it did not have information regarding the Debtor's allegations. Accordingly, it answered that it lacked information to admit or deny them.

In her Statement of Undisputed Facts, the Debtor reiterated the allegations made in her Complaint in more detail. In support of her factual assertions, she relied on Ranger's affidavit, Fairbanks's admissions and a Schedule of Payments, which was "[p]repared using software accompanying the publications of the National Consumer Law Center," as well as Brando's deposition testimony, and other documentary evidence.

In its Response to the Debtor's Request for Admissions, Fairbanks admitted that under the terms of the 1991 Note, the Debtor's monthly payment for 59 months

was $2,005.71. It refused to accede to Plaintiff's request that it admit that she would owe a balloon payment of $149,600.71 when the loan matured, claiming the request was unintelligible. Despite Fairbanks's assertion that the Debtor's request was unintelligible, if the monthly payments were $2,005.71, as Fairbanks admitted, a balloon payment in the sum of $149,600.71 would be due and owing when the loan matured. That sum is supported by the Schedule of Payments prepared using the National Consumer Law Center's software, and it is an amount that is in excess of the original principal amount of the 1991 loan from ITT.

According to tax returns attached to the Statement of Undisputed Facts, in 1990, the Debtor's adjusted gross income was $5,671 and Ranger's adjusted gross income was $18,756, for a combined total of $24,427. The annual payments due and owing ITT totaled $24,068.52, an amount equal to 98.5% of the Maxwell's and Ranger's total annual income.

Fairbanks does not have any documentation to establish that the required TILA/ MCCCDA disclosures were made to the Debtor. Ranger in an affidavit attached to the Debtor's Statement of Undisputed Facts, stated: "I attended a loan closing with my grandmother in Rhode Island on February 12, 1991, and we did not receive any documents related to that loan." Fairbanks produced no evidence to counter Ranger's sworn statement. Specifical-

ly, in Defendant's Response to Debtor–Plaintiff's Second Request for Admissions Propounded to the Defendant, Fairbanks admitted that it had no HUD–1 settlement documents for the 1991 ITT loan; that it had no Truth in Lending disclosure documents for the 1991 loan; that it had no Notice of Right of Rescission for the 1991 loan; and that it had no documents establishing that the Debtor was informed or otherwise notified of her rescission rights with respect to the 1991 loan. Fairbanks, however, specifically denied that a "Non–Performing Loan Sale Agreement" dated September 10, 1999 between Fairbanks and FC Capital Corp. was the only documentary evidence of the Debtor's indebtedness. Fairbanks also refused to admit or deny that it had no Disclosure Statement for the 1991 loan because the Debtor did not define "Disclosure Statement."

According to Fairbanks, on or about January 15, 1998, the servicing rights to the 1991 loan were transferred to it. No documentation substantiates this assertion, particularly because the Non–Performing Loan Sale Agreement between Fairbanks and FC Capital Corp. is dated September 10, 1999 and the Assignment from Transamerica to Fairbanks, discussed in more detail below, is dated "October 1999."

Despite the acquisition of servicing rights, Brando, testified that Fairbanks "never had the prior payment history from the prior servicer." Deposition Transcript at 77.[3] He added that he could not say

---

**3.** The witness reiterated this point later in the deposition as follows:

Q. Do you know if the prior note holder in this case provided you with the principle [sic] amount? Do you know?

A. Me personally? No. From speaking with Arron [sic], I was told that no, we didn't have a prior payment history. . . .

 \* \* \* \* \* \*

Q. Is there—and there is no payment history to support this principle [sic] amount that you have seen, correct?

A. Correct.
Deposition Transcript at 87–88.

what happened when the prior lender owned the loan. When pressed as to how Fairbanks could determine the amount the Debtor owed it if it lacked a payment history, the witness stated: "I go off of whatever that computer has for me and what it offers me, because that's all the information that we would have. No one would have any more or less than that." *Id.* Brando also testified that he could not recall seeing a date upon which the Debtor's note went into default. Additionally, he indicated that he was told only that the Debtor owed principal, interest and a corporate advance, stating "I don't remember if he [a superior named Aaron Lewis] told me exact what was the arrears. That's the only three figures I remember him telling me." *Id.* at 79. When asked how he would know whether interest would continue to accrue after the maturity date of the Debtor's loan, Brando replied that "[i]t all falls back on that same theory as whatever is put into our system or computer, that's how I get all my information." *Id.* at 91.

Fairbanks maintains a Contact History Report, which is a computerized record of information about the status of the loans that it services. Its personnel document letters it sends to mortgagors, phone calls and other events associated with the servicing of its loans beginning with a so-called "hello letter." Specifically, the Report contains the date, the time, the identity of the person at Fairbanks making the contact or taking a specific action, the type of contact or event, the date of completion and a description of the contact or event. For example, Fairbanks' Contact History Report for Maxwell's loan contains the following entries, beginning with a "hello letter."

| Date | Time/Who | Type | Complete | Description |
|------|----------|------|----------|-------------|
| 01/01/98 | : SHELLEY | LETT | 02/02/98 | Hello Letter |
| 01/27/98 | 1:31 PM BRENTT | NOTE | 01/27/98 | per scrub: Status: Current. no note so [sic] mortgage. no current pay history. Rebuilt file. no title work. Unable to confirm lien position. Need to order title work. Rate on system is 0. APR 16% BLT |
| 01/29/98 | : STANF | FLUP | 02/05/98 | Need 1st Lien Holder Balance Update. Last Update Was: // Last Balance Was: 0.00 |
| 1/30/98 | : SHELLEY | LETT | 02/03/98 | Hello letter |
| 01/30/98 | : SHELLEY | LETT | 02/02/98 | Hello Letter—TA-x9 Servicing Started 1/15/98 |
| ?/98 | : MIKE | FLUP | 02/18/98 | Need 1st Lien Holder Balance Update. Last Update Was: // Last Balance Was: 0.00 |
| 02/10/98 | 8:45 AM HEIDI | CONT | 02/10/98 | Borr cld in wanted info on her loan I advised that because of the audit were not able to gv her the info that she needs at this time and we will call her when we are able. |

As is evident from the descriptions set forth above, Fairbanks's employees use a type of shorthand to describe the contact or event, do not adhere to rules of grammar, punctuation, or capitalization, and, presumably, because they are working in haste or transcribing the content of a conversation while it is taking place, make a lot of spelling and other mistakes. Thus,

for example, "borr" and "brrwr" stand for borrower, "tt" stands for talked to, "FC" or "fc" stand for foreclosure, and "BPO" stands for broker's price opinion. Moreover, the Contact History Report sets forth the events in reverse chronological order. In the example above, the Court set forth the events in chronological order.

In the hello letter to the Debtor dated January 30, 1998, Fairbanks, referring to a payment of $2,005.71, stated the following:

> We are pleased to inform you that the servicing of your mortgage loan, that is, the right to collect payments from you, has been assigned, sold or transferred from Transamerica Home Loan to Fairbanks Capital Corp. effective January 15, 1998. Fairbanks began accepting payments on your loan on January 15, 1998.

At the end of the letter, Fairbanks included "Disclosures Pursuant to Section 6 of the Real Estate Settlement Procedures Act (RESPA)(12 USC 2605)." [4]

The Contact History Report documents the Debtor's efforts to obtain from Fairbanks information about her loan. Ironically, it also documents efforts by Fairbanks to get information from the Debtor or her agents about her loan. The entry in the Contact History Report dated January 27, 1998 establishes that Fairbanks had no information whatsoever about the Debtor's loan: "no note so [sic] mortgage, no current pay history. Rebuilt file. no title work. Unable to confirm lien position." Additionally, what information it had was wrong, i.e., "Status Current."

On February 12, 1998, less than two weeks after Fairbanks mailed the Debtor a hello letter, Sandra M. McKee ("McKee"), a Foreclosure Prevention Counselor from Ecumenical Social Action Committee, Inc., called Fairbank, on behalf of the Debtor, "requesting servicer information." She indicated that she would fax permission to Fairbanks to enable its personnel to disclose information about Maxwell's loan directly to her. On February 26, 1998, a Fairbanks's employee indicated that he had not received the fax. On March 4, 1998 McKee called Fairbanks again. The Contact History Report reveals that McKee volunteered information about Maxwell. A Fairbanks employee recorded that McKee stated that "brrwr is on a

---

4. The letter contained the following:

During the 60–day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loans servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) give you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 Business Days of receive [sic] of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account numbers, and your reasons for the request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60–Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

\* \* \* \* \* \*

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

balloon note and is is [sic] mature / / she wanted to see what can be done to avoid FC [foreclosure] / / I avsd [advised] we need to wait until file has been audited and I then [sic] we can discuss it I avsd her ti [sic] will take a few weeks. . . ." On April 1, 1998, McKee called Fairbanks again inquiring about the Debtor's loan, particularly "prncple balance. . . . . the status . . . . and the terms of loan . . . ." McKee informed Fairbanks that the Debtor was supposed to make a balloon payment in 1996 but never did so. On April 7, 1998, McKee again faxed a release to Fairbanks, which it received, and talked to Woody, advising him that she would put "a package together to show us what brr can do."

On April 14, 1998, McKee sent a letter to Fairbanks's "Payoff Department." In the letter she stated: "I am working with the above borrower and am requesting an *itemized* pay-off figure for this loan. I have twice received the information below, which does not show arrearages and a total payoff amount." McKee included with her letter a copy of a "Statement of Mortgage Loan Account as of February 19, 1998" in which Fairbanks indicated that the original balance was $149,151.00; the principal balance was $149,925.22; the total payment was $2,005.71; the loan type was "CONV. RES."; the loan date was February, 1991; the maturity date was March, 1996; the due date was March, 1997 and the interest rate was 5.999% [sic].

On April 16, 1998, a Fairbanks employee made the following entry in the Contact History Report: "brr cn not pay debt, Sandra fr/ESAC [Ecumenical Social Action Committee] is going to put the house up fr/sale td [told] her mean while [sic] we will proceed with FC we have no other choice." On the same day, Fairbanks sent McKee a letter indicating that the principal balance of the loan was $149,925.22, that the interest due was $113,927.91, and

that "Force Place Ins." owed was $750, for a total payoff amount of $264,603.13.

One week later, on April 23, 1998, Fairbanks sent the Debtor´a demand letter, claiming it was owed $363,603.38, an amount $99,000.25 more than what it had claimed just seven days earlier. In the letter it stated the following:

> This letter constitutes formal notice of default under the terms of the Note and Mortgage or Deed of Trust because of failure to make payments set forth in the Note.
>
> As of 04–23–98 total payment due are: $ 299,850.44
> Plus delinquent interest payments of: $ 63,752.94
> For a combined total amount due of: $ 363,603.38

In the letter, Fairbanks advised the Debtor that in the event she failed to pay the above sums on or before May 23, 1998, it would accelerate the entire unpaid balance (even though the loan had matured) and initiate foreclosure proceedings. It also advised the Debtor of the following:

> The Fair Debt Collection Practices Act requires us to inform you that this is an attempt to collect a debt. Any information obtained will be used for that purpose. Unless you dispute the validity of the debt within 30 days after receipt of this notice, we shall assume the debt to be valid. If you notify us in writing of your dispute within this 30–day period, we will obtain verification of the debt and will mail you a copy. Upon your written request within the 30–day period we will provide you with the name and address of the original creditor if different from the current creditor. *The Fair Debt Collection Practices Act permits institution of legal action prior to the expiration of the aforementioned 30–day period.*

On April 24, 1998, the Debtor wrote a letter to Mara Willis at Fairbanks requesting specific information about her loan "[u]nder the guidelines of the Real Estate Settlement Procedures Act (RESPA)."

After identifying her loan number and the street address of her property, she asked Fairbanks to provide her with copies of original loan documents, including the HUD Settlement Sheet, the TILA Disclosures, a copy of the Complete Mortgage, the Loan Note and Notice of Right of Rescission. Fairbanks did not respond to the Debtor's letter.

Following the mailing of the demand letter, Fairbanks continued to communicate with McKee, who suggested to Fairbanks that the Debtor would be proposing a short pay off of the loan. Fairbanks, through its personnel, attempted to obtain information from McKee about the first lien holder on the property. On May 1, 1998, a Fairbanks employee recorded the gist of the following conversation with McKee:

> TFS [Transamerica Financial Services] should be the first .. this loan should be a first not a second lien ... mrs [the Debtor] has no idea where her note or deed is .. ? Sandra has made calls and looked with other servicing co and they have no records.. Sandra concerned loan moving into fc and wants to prevent that .. Told her that it would be difficult for brwr to be on fb [first base?] with loan so upside down .. Her only option may be to deed the pprty [property] over and move.. Advsd Sandra chance loan may be sold back to TFS and she would to [sic] deal with them from then on out on fc.... Advsd her shld knw next few weeks if loan going back to TFS or staying here.. Sandra advses me still will look at sending over an offer on poss shrt payoffff ..

The same day, another Fairbanks employee recorded that he "Clld Sandra M with ESAC for poss 1st lien info." On May 4, 1998, an employee recorded in the Contact History Report that he had "Rcvd notice from legal that FCC [Fairbanks] does not have the file hence no title report—legal recomm. pulling CBR to find this info."

Approximately one month later a Fairbanks employee reported that "[t]here was not enough info in the file, or the C.B.R., to verify a first lien holder. We need to order a Tilte [sic] report." The next day a different employee reported that "loan is being repriced so it is undetermined whthr or not FCC will purchse loan." Thus, in June of 1998, Fairbanks internal records establish that it was not the owner of the Debtor's Note and Mortgage.

On July 31, 1998, the Contact History Report discloses a conversation among Fairbanks's employees: "Rvwd file with WW // best option is to get borrower on FB with poss to MOD/ / *need to urge borrower to get us a photo copy of Promissory note.*" (emphasis added). Thus, almost six months after advising Maxwell that as servicer of her loan she was to make payments to it, and approximately three months after it threatened foreclosure, Fairbanks still did not have a copy of the Note and was unaware of its lien position on the Debtor's property.

In August, 1998, Fairbanks's personnel made a series of entries about making a deal with the Debtor. For example, an employee wrote: "please review with attnys to see if dil poss on this loan .. and see about the first if any on this loan...." On August 31, 1998, Fairbanks's employees again recognized that "[t]here are no orig docs in the file and matured note on loan..... Brwr advsd to stay in home for several more months till decision is made...." In a follow up note for the record, made on September 23, 1998, employees were advised to "Monitor weekly to see if legal has made decision to FC or to move ahead to repurchase status ... you shldl [sic] not need to call... There are no wrkouts [workouts] that combat can offer the brrwr ..."

Between September of 1998 and mid-July 1999, the Contact History Report reveals little activity with respect to the account while the Debtor investigated refinancing her property, although in view of the September 23, 1998 entry set forth above, it is questionable whether Fairbanks would have been receptive to any offer the Debtor made. Harold Raymond ("Raymond"), a Foreclosure Prevention Counselor at the Veterans Benefits Clearinghouse Mortgage Corporation, Inc., attempted to help the Debtor beginning in mid–1999 though the end of that year. He assisted Maxwell in preparing short payoff letters to Fairbanks dated July 24, 1999, September 20, 1999, and October 19, 1999.

On July 10, 1999, the Contact History Report reveals that a Fairbanks employee changed the status of the loan "from repurchase to current so that loan is redemanded," adding "[w]e no longer have recourse to TA [Transamerica]. Work as normal."[5] On July 13, 1999, Fairbanks sent a second demand letter to the Debtor. This time it demanded immediate payment of $121,948.38. Again, Fairbanks referenced the FDCPA, stating at the bottom of the letter, "This letter is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose."

Although Fairbanks demanded $121,948.38 from the Debtor in mid-July, 1999, less than six weeks later, on August 26, 1999, it advised Raymond that it would not accept the Debtor's offer of $120,000. A Fairbanks employee inserted the following in the Contact History Report:

we are first and we rather send this acct to fc and can make more than what they are offering us. adv him need to up

offer. said that his trying to have m1 live in the house and keep the house. told him if they want to keep house need to start selling stuff or brwr funds from relative and get some other loan to up offer. Told him we will not accept offer at 120k. adv him might looking at increasing offer to 179k. Said will try. . . .

Four days later, however, a Fairbanks's employee wrote in capital letters: "I AM NOT REFERRING TO FC YET BCSE [because] WE HAVE TO FIND OUT WHAT LIEN POSITION WE ARE." In an apparent reply, "Woody" indicated that Fairbanks had referred the matter to foreclosure, adding "we can not lose any more time on this" and "[i]n the future when you have an issue where we suspect our information on the system is wrong we can order a preliminary title search as soon as you find the disputed info from a debtor."

On September 8, 1999, Fairbanks commenced foreclosure proceedings against Maxwell. The Contact History Report reveals that Attorney Richard Foreman advised Fairbanks that the foreclosure complaint would be filed by September 11, 1999. Approximately one month later, the Report indicates that Fairbanks was struggling to sort out the series of assignments pertaining to the Debtor's loan ("Rcvd orig unrcrd assign TA to FCC and fwded with orig unrcrd assign from ITT to TA to TW").

On November 5, 1999, Fairbanks approved a short payoff of the Debtor's loan in the amount of $192,000. Although that payoff amount was approved, Fairbanks refused the Debtor's request for an extension of time to close the refinancing transaction, and the Debtor was unable to proceed. Because a foreclosure sale was

**5.** The only evidence in the record as to when Fairbanks acquired the Note and Mortgage is the Non–Performing Loan Sale Agreement between FC Capital Corp. and Fairbanks dated September 10, 1999 and the October 1999 assignment from Transamerica to Fairbanks, discussed *infra*.

scheduled for December 9, 1999, the Debtor filed a Chapter 13 bankruptcy petition on December 7, 1999. Shortly thereafter, a Fairbanks employee cynically reported: "PEARL MAXWELL (fc or short deal?) * * Dead deal because customer filed bankruptcy... This is a stall tactic because I doubt she can afford to cure our delinquent amount on a 60month [sic] plan .. We'll see her back on fc soon." In mid-December, 1999, a Fairbanks employee requested that a copy of the Debtor's Note be forwarded from the custodian "to jill in bk [bankruptcy] asap!!!!" Several days later, the Contact History Report indicates that "Leslie only has LNA [Lost Note Affidavit]."

The Contact History Report also reveals that in February of 2001 Fairbanks still had problems with the Debtor's file. An employee reported: "We have checked with foreclosure reps; *no one has this file.* Can you please doublecheck the archive records?" (emphasis supplied). The responses, from another employee: "I checked again and the same story, if I find it I will let you know asap." In late March, an employee wrote: "Recv'd coll. file and frwd'd to Aaron Lewis."

In the Debtor's first Chapter 13 case, Attorney Richard Foreman, on behalf of Fairbanks, filed, on February 18, 2000, a Motion for Relief from the Automatic Stay. In its motion, Fairbanks represented that it had been assigned the Debtor's Note and Mortgage and that because the Debtor had failed to make her monthly mortgage payments it had scheduled a foreclosure sale. It also represented the following:

> The debtor executed *a daily simple interest Note* which means that she accrues interest each day so the amount of outstanding interest through the date of her filing reached $153,103.77 and at the end of the plan an additional $121,266.60 would be added along with recoverable attorney fees and escrow advances for a total of $430,707.28.
>
> The Debtor previously incurred legal fees and costs in accordance with her Note and Mortgage for foreclosure proceedings in the amount of $3,973.34 which would be added to her pre-petition arrearages.
>
> The Debtor has now incurred legal fees and costs in accordance with her Note and Mortgage for foreclosure proceedings in the amount of $600.00 and bankruptcy proceedings in the amount of $875.00 which would be added to her post-petition arrearages.
>
> $309,463,68 [sic] is the amount needed to payoff the loan as the date of this Motion to which would be added prior fees and costs for foreclosure proceedings of $3,973.34; and current fees and costs for foreclosure proceedings of $600.00 and bankruptcy proceedings of $875.00 for a total of $314,912.02.

Motion of Fairbanks Capital Corp. Motion for Relief From the Automatic Stay [sic] at 2–3 (emphasis added). Thus, Fairbanks, in February 2000, represented that the Debtor owed it $48,691.36 *less* than what it demanded of the Debtor in April of 1998 and $192,963.64 *more* than it demanded of her on July 13, 1999.

Fairbanks attached a copy of the "Assignment of Mortgage/Deed of Trust" to its Motion. It indicated that the Assignment was duly recorded in the Suffolk County Registry of Deeds on January 28, 2000 as Instrument Number 559. The Assignment, which was recorded after Fairbanks had commenced foreclosure proceedings and after the Debtor filed her first Chapter 13 petition, shows that it was made by HFTA First Financial Corporation, Successor by name change to Transamerica Financial Services, A California Corporation, by Transamerica Home Loan, Its Attorney In Fact and was executed by

an Assistant Secretary of Transamerica "this day of *October,* 1999" [sic]. It was notarized on "October 20, 99." [sic].

In addition to filing a Motion for Relief from the Automatic Stay in the Debtor's prior Chapter 13 case, Jill Lauritzen ("Lauritzen") filed, on behalf of Fairbanks, a Notice of Appearance and Request to be Added to the Mailing Matrix (the "Notice"). In the Notice, Fairbanks represented the following: "COMES NOW, Fairbanks Capital Corp., *as agent for Opportunity Funding I LLC,* and hereby files its notice of appearance. . . ." (emphasis added). In addition, Lauritzen filed, on behalf of Fairbanks, a proof of claim and a Lost Note Affidavit. In the proof of claim,[6] which was signed by Lauritzen on January 11, 2000, and filed with the Court on January 19, 2000, Fairbanks indicated that it, not Opportunity Funding I LLC, had a secured claim in the sum of $309,463.68 and that the "[a]mount of arrearage and other charges at time case filed included in secured claim above if any *$430,707.28.*"[7] Lauritzen also executed the Lost Note Affidavit, which is dated July 6, 1999. In her Affidavit, Lauritzen stated, among other things, that she was the Assistant Secretary–Document Control for Fairbanks, and

> That, after having conducted a diligent investigation in its records and files, the Company has been unable to locate the following original note and believes that said original note has either been lost, misfiled, misplaced or destroyed:
>
> A note in the original principal sum of $149,151.00 made by Pearl Maxwell and Maritza Ranger, to Aetna Finance

Company, and dated February 12, 1991.

\* \* \* \* \* \*

> That the records of the Company do not show that such a note was ever released, paid off, satisfied, assigned, transferred, pledged, hypothecated or otherwise disposed of and that such note has been either lost, mislaid, misfiled or destroyed by the Company;
>
> That the Company is aware that _____, its successors, assigns and/or transferees (collectively, the "Owner") rely upon the statements made herein as to such note having been lost, mislaid misfiled or destroyed by the Company and never having been released, paid off, satisfied, assigned, transferred, pledged, hypothecated or otherwise disposed of. . . .

\* \* \* \* \* \*

> The Company hereby indemnifies and holds the Owner harmless from and against any and all losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from the Company's breach of any covenant, representation or warranty contained hereon or based upon the loss, misplacement or destruction of the lost note.

Lost Note Affidavit at 1. Thus, Fairbanks, in the Lost Note Affidavit, implicitly suggests that another unidentified entity was the Owner of the Note.

---

**6.** The proof of claim form used by Fairbanks contains the following warning at the bottom: "Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. § 152 and 3571."

**7.** Fairbanks claimed, not the amount due at the time the Debtor filed her petition, but an amount due at the end of the plan. *See* Ex. A attached to this decision.

In the Debtor's present Chapter 13 case, Attorney Richard Foreman, on behalf of Fairbanks, filed a Motion for Relief from the Automatic Stay, representing that the Debtor filed her Chapter 13 case to thwart a foreclosure sale scheduled for June 22, 2000. In its Motion, which it filed on June 30, 2000, Fairbanks stated the following:

> The debtor executed *a daily simple interest Note* which means that she accrues interest each day so the amount of outstanding interest through the date of her filing reached $166,762.92 and at the end of the plan, outstanding interest will reach $288,362.67 to which would be added recoverable attorney fees and escrow advances.

Motion of Fairbanks Capital Corp. Motion for Relief from the Automatic Stay at 2 (emphasis added). As a result of accruing legal fees and escrow advances, Fairbanks represented that "$319,463.24 is the amount needed to payoff the loan as of the date of the filing to which would be added prior fees and costs for foreclosure proceedings of $4,710.16 and prior fees and costs for bankruptcy proceedings of $1,840.00 and current fees and costs for bankruptcy proceedings of $920.00 for a total of: $326,933.40." *Id.* Thus, Fairbanks sought $36,669.98 *less* than what it demanded from the Debtor on April 23, 1998 and $204,985.02 *more* than what it demanded of her on July 13, 1999.

Fairbanks attached the July 6, 1999 Lost Note Affidavit to its June 30, 2000 motion. Moreover, documents attached to Fairbanks's Motion for Relief from the Automatic Stay show that Computer & Equipment Leasing Corporation, a Wisconsin Corporation, successor in interest by merger to Aetna Finance Company, d/b/a ITT Financial Services, assigned all its rights, title and interest in the Note and Mortgage executed by Maxwell and Ranger on February 12, 1991 to Transamerica and that Transamerica, assigned the Note and Mortgage to Fairbanks in October of 1999.

In summary, the evidence submitted established that Fairbanks made the following six different representations to the Debtor, her agent, McKee and to the Court as to the amount of the Debtor's obligations to it:

| | |
|---|---|
| April 16, 1998 letter to McKee | $264,603.13 |
| April 23, 1998 demand letter to the Debtor | $363,603.38 |
| July 13, 1999 demand letter to the Debtor | $121,948.38 |
| January 19, 2000 proof of claim | $309,463.68/$430,707.28 8 |
| February 8, 2000 Motion for Relief | $314,912.02 |
| June 30, 2000 Motion for Relief | $326,933.40 |

In its response to the Debtor's request for admissions, Fairbanks, however, admitted that the Debtor did not owe it any of the sums it set forth in letters to her or her agent or in pleadings and documents filed with the bankruptcy court.

## IV. DISCUSSION

A brief overview of the evidence is warranted. Fairbanks, at no time, produced, or showed that it had, a payment history for the Debtor's loan. Fairbanks, at no time, produced, or showed that it had, copies of the TILA disclosures that are required by law, including the MCCDA, to be given to a mortgagor. Fairbanks, at no time, produced, or showed that it had, the original or a copy of the Debtor's Note. Thus, Fairbanks does not have, and never had, any way of ascertaining the extent of the Debtor's obligation under the 1991 Note to ITT. Although it knew from the Mortgage that the APR on the Note was 16%, it could not represent that the Note was "a daily simple interest Note," and it

---

8. The proof of claim contained two figures: $309,463.68 as the secured claim and $430,707.28 as the "Amount of arrearage and other charges at time case filed included in secured claim above if any."

had no information about other terms that may or may not have been included in the Note, including the Debtor's obligation to pay attorneys' fees and interest after the loan matured. Nevertheless, Fairbanks, in a shocking display of corporate irresponsibility, repeatedly fabricated the amount of the Debtor's obligation to it out of thin air. There is no other explanation for the wildly divergent figures it concocted in correspondence with the Debtor and her agents and in pleadings and documents filed with the bankruptcy court. The question now becomes whether the Debtor has remedies for the actions taken by Fairbanks and, if so, what those remedies are.

### A. The Fair Debt Collection Practices Act

#### 1. Applicable Law

In *Hart v. GMAC Mortgage Corp. (In re Hart)*, 246 B.R. 709 (Bankr. D.Mass.2000), this Court examined whether the FDCPA applied to a mortgagee's conduct in representing to the debtor that he was required to repay a "negative suspense account." The Court summarized applicable sections of the FDCPA as follows:

> Liability under the FDCPA, a statute designed to protect consumers from "abusive, deceptive, and unfair debt collection practices," 15 U.S.C. § 1692(a), is predicated upon improper conduct on the part of "debt collectors" in collecting "debts" owed or allegedly owed by "consumers." It is to be liberally construed to effectuate its purpose. *See generally* Daniel A. Edelman, An Overview of the Fair Debt Collection Practices Act, 113 PLI/Corp. 87 (1999).
>
> \* \* \* \* \* \*
>
> The FDCPA contains substantive prohibitions that apply to "communications" with consumers. A communication is

defined to include "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). The FDCPA requires that debt collectors "disclose clearly in all communications made to collect a debt or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692e(11).

The FDCPA specifically proscribes "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. It also proscribes the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The statute provides the following with respect to false or misleading representations:

> Without limiting the general application of the foregoing, the following conduction is a violation of this section: . . .
>
> (2) The false representation of—
>
> (A) the character, amount, or legal status of any debt . . .
>
> \* \* \* \* \* \*
>
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken. . . .

15 U.S.C. § 1692e(2)(A) and (5). The FDCPA also makes it unlawful to "use unfair or unconscionable means to collect or attempt to collect any debt," including "[t]he collection of any amount (including any interest, fee, charge, or expenses incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating

the debt or permitted by law." 15 U.S.C. § 1692f(1).

In evaluating whether communications or conduct violates the FDCPA, courts utilize the so-called "least sophisticated debtor" standard. *Taylor v. Perrin, Landry, de Launay & Durand,* 103 F.3d 1232, 1236 (5th Cir.1997); *Clomon v. Jackson,* 988 F.2d 1314, 1318–19 (2d Cir. 1993); *Smith v. Transworld Systems, Inc.,* 953 F.2d 1025, 1028–29 (6th Cir. 1992); *Graziano v. Harrison,* 950 F.2d 107, 111 (3d Cir.1991); *Swanson v. Southern Oregon Credit Service, Inc.,* 869 F.2d 1222, 1225–26 (9th Cir.1988); *see also Gammon v. GC Services L.P.,* 27 F.3d 1254 (7th Cir.1994) ("unsophisticated consumer" standard). The Seventh Circuit has stated that "[a]nyway it's viewed, the standard is low," *Avila v. Rubin,* 84 F.3d 222, 226 (7th Cir.1996), and the phrase unsophisticated or least sophisticated debtor is used "to describe the hypothetical consumer whose reasonable perceptions will be used to determine if collection messages are deceptive or misleading." *Gammon,* 27 F.3d at 1257. The court observed that the standard protects consumers who are "of below average sophistication or intelligence" or are "uniformed, naive or trusting" while at the same time the reasonableness element "shields complying debt collectors from liability for unrealistic or peculiar interpretations of collection letters." *Id.*

Violation of any provision of the FDCPA entitles the consumer to an award of actual damages, statutory damages up to $1,000, costs and attorney's fees. 15 U.S.C. § 1692k(a). With respect to actual damages, which may include compensation for emotional distress, state law requirements that must be proven to establish negligent or intentional infliction of emotional distress are inapplicable. *See Teng v. Metropolitan Retail Recovery Inc.,* 851 F.Supp. 61, 68–69 (E.D.N.Y.1994); *Donahue v. NFS, Inc.,* 781 F.Supp. 188, 193–94 (W.D.N.Y.1991); *Smith v. Law Offices of Mitchell N. Kay,* 124 B.R. 182, 185 (D.Del.1991); *Crossley v. Lieberman,* 90 B.R. 682 (E.D.Pa.1988), *aff'd,* 868 F.2d 566 (3d Cir.1989).

246 B.R. at 729–30.

### 2. Positions of the Parties

The Debtor maintains that Fairbanks is a "debt collector" within the meaning of the FDCPA and that it made false and misleading representations as to the amount of money she owed, and that it also violated § 1692(f)(1) of the FDCPA. In its Opposition to the Debtor's Motion for Partial Summary Judgment Fairbanks represents that "it is not a 'debt collector' under the meaning of the act [FDCP] because in this case, it is collecting its own debt, thus falling under the 'in-house' exception." Opposition at 4. Relying upon the Assignment of Mortgage/Deed of Trust executed "this day of October, 1999" between Transamerica and Fairbanks, it adds that while it has admitted that it acts as a debt collector for other loans, the Debtor "misconstrued this as an admission that it is as a debt collector in every circumstance." *Id.*[9]

### 3. Analysis

There is no dispute that the Debtor is a "consumer" within the meaning of the FDCPA. Indeed, her deposition testimo-

**9.** Although it only pointed to the two assignments, it stated "Defendant owns the note at issue. Defendant has established this by producing a chain of title with properly recorded assignments and providing notifications of the assign to debtor." There was no evidence that Fairbanks notified the Debtor of the October 1999 assignment.

ny reveals that she easily fits the paradigm of the "least sophisticated debtor."

■ The Court rejects Fairbanks's assertion that it is not a "debt collector." Its argument is frivolous and unsupported by the record, i.e., its Contact History Report, its representation that it was subject to the FDCPA in its demand letters to the Debtor, Brando's testimony, and the assignment from Transamerica to Fairbanks, dated October 1999. Even if Fairbanks obtained ownership of the Debtor's Mortgage in October of 1999 and ceased to be a debt collector at that time,[10] it sent at least three communications to the Debtor or her agent prior to that time in which demanded sums from the Debtor that it admits she did not owe. Specifically, on April 23, 1998 and July 13, 1999, Fairbanks sent demand letters to the Debtor in which it represented to her that it was acting as a debt collector under the FDCPA. Thus, Fairbanks's argument that it is not a debt collector is contradicted by the record in this case.

■ Having found that Fairbanks is a debt collector, at least with respect to three communications with the Debtor or her authorized agent, McKee, the Court must determine whether Fairbanks violated the FDCPA. By its own admission it has violated § 1692e(2)(A) because it demanded amounts of money from the Debtor that she did not owe. Moreover, the Court finds that Fairbanks violated § 1692f(1) of the FDCPA by demanding post-maturity interest on the 1991 loan. Because Fairbanks did not have possession of the Note, it could not ascertain whether it was entitled to demand such interest. Accordingly, it attempted to collect interest without the express authorization of

the agreement creating the debt in violation of 12 U.S.C. § 1692f(1).

■ Fairbanks argues that even if this Court determines that it is a debt collector it is not liable to the Debtor due to the bona fide error exception. That exception is set forth in § 1692k(c) of the FDCPA and provides the following:

> A debt collector may not be liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error *notwithstanding the maintenance of procedures reasonably adapted to avoid any such errors.*

15 U.S.C. § 1692k(c)(emphasis supplied). "[T]he bona fide error defense applies only to clerical errors." *Smith v. Transworld Systems, Inc.,* 953 F.2d 1025, 1034 (6th Cir.1992); *Baker v. G.C. Services Corp.,* 677 F.2d 775, 779 (9th Cir.1982).

In support of its position that it is immunized from liability under the FDCPA, Fairbanks makes the following argument:

> Defendant has relied on the information in its possession in collecting on the note. The Defendant has never intentionally made false representations as to the amount due and owing. In fact, in every instance where Defendant noticed a discrepancy, Defendant, on its own initiative, immediately admitted its error and set forth new information. Therefore, since Defendants [sic] misrepresentations were unintentional, and since Defendant relied upon the information in its possession, Defendant is not liable under the FDCPA due to the bona-fide error exception. Therefore, since Plaintiff fails to meet the elements necessary

10. Because Fairbanks filed a Notice of Appearance on January 19, 2000, in the Debtor's prior Chapter 13 case in which it represented that it was acting "as agent for Opportunity Funding I LLC," the Court finds that there are genuine issues of material fact as to when Fairbanks obtained servicing rights versus ownership of the Note and Mortgage.

for proving Defendant violated FDCPA, summary judgment is warranted against the Plaintiff and in favor of the Defendant on this issue.

Defendant's Opposition at 5.

Fairbanks's argument is wholly unsupported by the record and devoid of merit. Fairbanks submitted *no evidence,* in the form of affidavits or otherwise, to support its bona-fide error defense. It submitted no evidence that it noticed discrepancies and on its own initiative immediately admitted errors and set forth new information. Much more importantly, it submitted no evidence that it had *and* maintained procedures for servicing loans, let alone procedures that were reasonably adapted to avoid errors of the kind found in this case. Indeed, Brando testified that Fairbanks's personnel relied exclusively upon the information in the company's computer system to make decisions. ("I go off of whatever that computer has for me ... because that's all the information that we would have. No one would have any more or less than that."). In view of the evidence that Fairbanks did not have the Debtor's payment history and did not have the Note executed by the Debtor, its utilization of wholly unsupported figures in the demand letters sent to the Debtor cannot be viewed as unintentional. There can be no suggestion of any computational or clerical errors because Fairbanks lacked sufficient information to make any computation at all as to the amount of the Debtor's obligation to it. Indeed, Fairbanks's employees strained to acquire information about the Note, going so far as to quiz McKee about its lien status and to ask her to get a copy of the Note from the Debtor. Its conduct was not the result of a bona fide error. Its conduct violated the FDCPA and was egregious and inexcusable. Where Fairbanks failed to present any evidence to support its bona fide error defense, and its Contact History Report repeatedly refers to the absence of information about the Debtor's loan, the Court finds that it is not entitled to the defense, a defense which, in any event, it failed to raise as an affirmative defense in its Answer.

 With respect to the Debtor's remedy for Fairbanks's violation of the FDCPA, the statute of limitations set forth in the FDCPA, 15 U.S.C. § 1692k(d), has been determined to be procedural and not jurisdictional, *see Marshall–Mosby v. Corporate Receivables, Inc.,* 205 F.3d 323, 327 (7th Cir.2000); *Clark v. Bonded Adjustment Co., Inc.,* 176 F.Supp.2d 1062, 1068 (E.D.Wash.2001); *but see Mattson v. U.S. West Communications, Inc.,* 967 F.2d 259, 263 (8th Cir.1992)(one-year in the FDCPA is jurisdictional, not procedural). Thus, the Debtor is entitled to reduce or satisfy any claims Fairbanks may have against her from the damages to which she is entitled due to Fairbanks's violation of the FDCPA, which include statutory damages in the sum of $1,000, actual damages, costs, and attorney's fees. Accordingly, the Court shall enter summary judgment in favor of the Debtor and against Fairbanks on the issue of liability under the FDCPA.

### B. *Real Estate Settlement Procedures Act*

#### 1. Applicable Law

Congress enacted RESPA in response to its finding "that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a).

Section 2605 of RESPA, which applies to servicers of mortgage loans and which Fairbanks referenced in its January 30, 1998 hello letter to the Debtor, provides in relevant part the following:

(c) Duty of loan servicer to respond to borrower inquiries

(1) Notice of receipt of inquiry

(A) In general

If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.

(B) Qualified written request

For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—

(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

(2) Action with respect to inquiry

Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall—

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

\* \* \* \* \* \*

(f) Damages and costs

Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:

(1) Individuals

In the case of any action by an individual, an amount equal to the sum of—

(A) any actual damages to the borrower as a result of the failure; and

(B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000.

\* \* \* \* \* \*

(3) Costs

In addition to the amounts under paragraph (1) or (2), in the case of any successful action under this section, the costs of the action, together with any attorneys fees incurred in connection with such action as the court may determine to be reasonable under the circumstances.

12 U.S.C. § 2605(e), (f).[11]

### 2. Positions of the Parties

The Debtor argues that both she and McKee made qualified written requests to Fairbanks for information about her loan and that Fairbanks failed to respond to the letters. Fairbanks argues that the April 14, 1998 letter was not a qualified written request because it was sent by McKee and the letter did not indicate that she was an agent for the Debtor. Fairbanks also argues that because someone other than the Debtor drafted her letter of April 24, 1998 and because the Debtor did not understand its contents, the letter does not constitute a qualified written request. It states: "[s]ince the debtor has no knowledge of the letter, there can be no qualified written request."

### 3. Analysis

The Court finds that McKee and the Debtor made qualified written requests for information to Fairbanks and that Fairbanks failed to respond in writing to the letters. For a written request to fit within the requirements of the statute, it must include the name and account of the borrower *and* include a statement for the belief, "to the extent applicable, that the account is in error" *or* provide sufficient detail about "other information sought by the borrower." *See* 12 U.S.C. § 2605(c)(1)(B). Both McKee and the Debtor included the Debtor's name, the loan number and the address of the Debtor's property in their letters. McKee requested an *"itemized* pay-off figure" for the loan, including arrearages. The Debtor requested documents, including the HUD Settlement Sheet, the TILA Disclosure Statement, the Note and the Notice of Right of Rescission. Fairbanks admitted that it did not respond to the two letters. Fairbanks thus violated the provisions of RESPA.

 With respect to Fairbanks's contention that McKee's letter was unqualified, the Court finds it to be specious argument. Its Contact History Report indicates that on April 7, 1998 it was in

---

**11.** RESPA also has a provision for class actions as follows:

2) Class actions

In the case of a class action, an amount equal to the sum of—

(A) any actual damages to each of the borrowers in the class as a result of the failure; and

(B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not greater than $1,000 for each member of the class, except that the total amount of damages under this subparagraph in any class action may not exceed the lesser of—

(i) $500,000; or

(ii) 1 percent of the net worth of the servicer.

12 U.S.C. 2605(f)(2).

receipt of an authorization to release information to McKee. Moreover, RESPA specifically contemplates qualified written requests from agents of borrowers. *See* 12 U.S.C. § 2605(c)(1)(A). Thus, McKee's letter of April 14, 1998 was a qualified written request for information to which Fairbanks failed to respond.

■ With respect to Fairbanks's argument that the Debtor's letter was unqualified because she did not actually write it or understand its contents and purpose, the Court finds this argument to be not only shameless, but unsupported by the statute, case law, and common sense. The statute contains no condition pertaining to the intellectual capacity of borrowers such that a written request would be rendered unqualified if the borrower did not understand its contents. On the contrary, RESPA was crafted by Congress to assist consumers in understanding and exercising their rights with respect to transactions which they might not be qualified to fully comprehend and which might affect retention of their homes. It would be contrary to the spirit, purpose, and express language of the statute to graft a comprehension requirement onto § 2605(e)(1)(B).

■ Fairbanks also argues that two instances of failing to respond to a qualified written request do not qualify as a pattern and practice on noncompliance.

The term "pattern or practice" in a federal statute is not a term of art but rather is defined according to the usual meaning of the words. *See Sperling v. Hoffmann–La Roche, Inc.*, 924 F.Supp. 1346, 1357 (D.N.J.1996) (discussing use of term in the ADEA). The term suggests a standard or routine way of operating. *See Newton v. United Cos. Fin. Corp.*, 24 F.Supp.2d 444, 456 (E.D.Pa. 1998) (term as used in TILA refers to "wide-ranging and institutionalized practices"). *See also First Nat'l Bank v.*

*Office of Comp'r of Currency*, 956 F.2d 1456, 1461–62 (8th Cir.1992) (failure to make interest rate disclosure required by TILA to 691 borrowers over two years constitutes pattern or practice).

*Cortez v. Keystone Bank, Inc.*, No. 98–2457, 2000 WL 536666 at *10 (E.D.Pa. May 2, 2000). In *Ploog v. HomeSide Lending, Inc.*, No. 00 C 6391, 2002 WL 433139 (N.D.Ill. March 19, 2002), the court determined that five failures to respond to qualified written requests constituted a "pattern or practice." In *In re Tomasevic*, 273 B.R. 682 (Bankr.M.D.Fla.2002), the court determined that a servicer's failure to respond to one qualified written request did not amount to a "pattern or practice." In view of the testimony that Fairbanks services a large number of loans in most, if not all, of the 50 states, the Court is unpersuaded that the Debtor has established a "pattern or practice" for purposes of RESPA's statutory damage provision by showing just two violations.

Because the Court has found that Fairbanks violated § 2605 of RESPA by failing to respond to her qualified written requests, the Court shall enter summary judgment in favor of the Debtor and against Fairbanks on Count C. Fairbanks shall be liable for the Debtor's actual damages, attorney's fees, and costs.

### C. *Violation of the Massachusetts Consumer Credit Cost Disclosure Act*

#### 1. Applicable Law

■ As the bankruptcy court recognized in *Fidler v. Central Cooperative Bank (In re Fidler)*, 226 B.R. 734 (Bankr. D.Mass.1998), the purpose of the MCCCDA and TILA is " 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed

use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.'" *Id.* at 736 (quoting § 1601(a) of TILA upon which the MCCCDA is modeled). Section 1 of the MCCCDA defines "material disclosure" as "the disclosure, as required by this chapter, of the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments and the due dates or periods of payments scheduled to repay the indebtedness." Mass. Gen. Laws Ann. Ch. 140D, § 1. *See also* MCCCDA §§ 4, 5, and 12. In addition, the MCCCDA requires that an obligor be given a notice of their right to rescind the loan:

> Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as a principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required by this chapter, whichever is later, by notifying the creditor ... or his intention to do so. The creditor shall clearly and conspicuously disclose in accordance with regulations of the commissioner, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the commissioner, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section. No finance or other charge shall begin to accrue on any such transaction until the termination of the

rescission period provided for in this section.

*Id.* at § 10(a). If a lender fails to make the required disclosure and fails to provide notice of the right to rescind, the consumer may exercise his or her right to rescind. Although an obligor's right to rescind "shall expire four years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding that the information and forms required under this section or any other disclosures required under this chapter have not been delivered to the obligor," *id.* at § 10(f), the rescission right may be asserted by way of recoupment under Mass. Gen. Laws Ann. Ch. 140D, § 10(i)(3). *See Fidler,* 226 B.R. at 737. In Fidler, the court unequivocally stated: "[b]y inserting this provision, the Massachusetts Legislature has essentially ended any debate over the meaning of the limitations period in ch. 140D, § 10(f). However else it may be construed, one thing is for certain: ch. 140D, § 10(f) does not affect the [Debtor's] right of recoupment." *Id.* The court in *Fidler* explained that "[t]o demonstrate that a claim is being asserted in recoupment, the following elements must be satisfied: (1) the TILA [or CCCDA] violation and the creditor's debt arose from the same transaction, (2) [The claimant] is asserting her claim as a defense, and (3) the 'main action' is timely." *Id.* (quoting *Smith v. American Financial Systems, Inc. (In re Smith),* 737 F.2d 1549, 1553 (11th Cir.1984)); *see also Coxson v. Commonwealth Mortgage Co. of America (Matter of Coxson),* 43 F.3d 189, 193 (5th Cir.1995).

This Court agrees with Judge Hillman's analysis in *Fidler.* The Debtor's rescission claim is not barred by the expiration of the four year statute of limitations set forth in the MCCCDA. If the Debtor establishes a violation of CCCDA and sat-

isfies the three-part test demonstrating that her claim is one for recoupment she may assert her right to rescind the contract.

### 2. Positions of the Parties

#### a. The Debtor

The Debtor asserts that neither she nor Ranger was provided with any of the required disclosures at the time they entered into the 1991 transaction. She adds that Fairbanks has known since it began servicing the Debtor's loan that it lacked the required disclosures. The Debtor relies upon *Frascatore v. Sec. of Housing and Urban Dev. (In re Frascatore),* 98 B.R. 710 (Bankr.E.D.Pa.1989), in which the court stated:

> The instant Debtors, like the respective *Herbert* and *Pinder* debtors, claim that they were never given any TILA disclosures statement at all. Lomas denies this, but having searched its files, has been unable to locate the disclosure statement, as was true of the mortgagees in *Herbert* and *Pinder.* Given the burden upon a creditor to prove compliance with the TILA, we believe that this status of the record, as in *Herbert* and *Pinder,* mandates the entry of judgment in favor of the Debtors on this claim.

*Id.* at 723. In *Pinder v. Lomas & Nettleton Co. (In re Pinder),* 83 B.R. 905 (Bankr. E.D.Pa.1988), the court determined that because the mortgagee produced no evidence that the Debtor received a TILA disclosure statement "to offset the Debtor's inconclusive but definite statements that she did not receive such a statement," *id.* at 907, no such statement was received by the debtor. In *Herbert v. Fed. Nat'l Mortgage Assoc. (In re Herbert),* 86 B.R. 433 (Bankr.E.D.Pa.1988), the court reiterated what it determined in *Pinder,* stating the following:

The Debtor here, somewhat more candidly than the *Pinder* Debtor, expressed lack of knowledge of the documents given to her. Like the *Pinder* Debtor, she could not locate a TILA disclosure statement in the midst of the "stack of papers" she received at settlement. Moreover, here, in more convincing fashion than in *Pinder,* where we had only the Debtor's assertions of same, the Debtor actually produced the entire "stack of papers," and the TILA disclosure statement was not among them. The testimony of both the Debtor her [sic] and in *Pinder* is and was exactly what we would expect from an "average consumer." Like the *Pinder* mortgagee, FNMA presented not a speck of evidence that the Debtor in fact did receive a TILA disclosure statement. As we stated in *Pinder,* we believe that the much more knowledgeable creditor must be charged with the burden of producing a disclosure statement, if asked to do so prior to trial. And, if it is unable to do so, and the consumer presents some evidence supporting a contention that one was never received, we must assume that none exists.

*Id.* at 438.

#### b. Fairbanks

While admitting that it "has not been able to find certain documents with regard to this loan, including a disclosure statement," Fairbanks asserts that "other evidence *suggests* that TILA disclosures were provided." Opposition at 8 (emphasis supplied). It points to the Mortgage and a TILA disclosure statement dated November 17, 1995 with respect to a loan modification in which the amount financed was $180,412.93 and the total of payment was $542,859.00. Fairbanks also states that its admissions and Brando's deposition testimony that he was not aware of any disclosures is "not conclusive evidence that

Plaintiff did not receive disclosures." *Id.* Rather, Fairbanks argues that its admissions and Brando's testimony are only evidence that it has not been able to find certain documents.

Fairbanks makes other arguments in an attempt to shield itself from liability. It argues that because the Debtor is "unable to remember or to understand numerous documents that she signed" her assertion that she did not receive the documents is not credible. *Id.* Moreover, it argues that because the Debtor "never attempted to compare the terms of the note at issue with any other loan or note. . . . even if it is found that Defendant violated TILA, there are no damages to Ms. Maxwell since she did not take advantage or her right to compare various credit terms, nor did she understand any credit terms." *Id.* at 9.

### 3. Analysis

Fairbanks can produce no evidence to contradict Ranger's statement that she and the Debtor did not receive "any documents related to the loan." Although Fairbanks attempts to distinguish the Pennsylvania bankruptcy cases cited above, its attempts are futile as the bankruptcy court's holding, with which this Court agrees, is that upon the submission of evidence that disclosures were not made, the burden shifts to the lender to produce evidence that it or its predecessor provided the requisite disclosures.

Although Maxwell may have been confused about the 1991 loan transaction, her granddaughter was not. Fairbanks produced no evidence to rebut Ranger's affidavit in which she stated unequivocally that neither she nor her grandmother received the disclosures to which they were entitled.

The Court finds that Fairbanks's position that a 1995 disclosure statement and the Mortgage are probative of the Debtor's receipt of material disclosures and a notice of a right of rescission for the 1991 transaction fails to create a genuine issue of material fact and, indeed, is preposterous. One document prepared four years after the transaction at issue and the Mortgage itself are insufficient to create a genuine issue of material fact about what transpired in 1991. Fairbanks produced no evidence that the disclosures were made, and it can not now produce such evidence because discovery has closed.[12] Accordingly, its attempts to distinguish the cases relied upon by the Debtor is unavailing. It failed to meet its burden, and the Debtor is entitled to rescind the loan under the MCCCDA.

Fairbanks's alternative arguments are easily dismissed. At best novel and at worse callous and appalling, the Court shall not consider the Debtor's lack of mental capacity or ability to shop for better credit terms a bar to summary judgment. Not surprisingly, Fairbanks did not and cannot cite any decisions which hold that the MCCCDA and its remedies do no apply to individuals who are old or uneducated.

Turning to the elements of a recoupment claim articulated by the court in *Fidler,* 226 B.R. at 737, the Court finds that the Debtor established a violation of the MCCCDA by ITT; that she is asserting her claim as a defense to Fairbanks's Motion for Relief from the Automatic Stay and that the "main action," namely the Motion for Relief from the Automatic Stay, is timely. Accordingly, the Court finds that the Debtor, by way of recoupment, may rescind the 1991 transaction.

**12.** The deadline for completion of discovery was March 29, 2002.

### D. *Unconscionability*

#### 1. Applicable Law

In *Waters v. Min Ltd.*, 412 Mass. 64, 587 N.E.2d 231 (1992), the Supreme Judicial Court described the doctrine as follows:

[It] ... has long been recognized by common law courts in this country and in England. "Historically, a [contract] was considered unconscionable if it was 'such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.' Later, a contract was determined unenforceable because unconscionable when 'the sum total of its provisions drives too hard a bargain for a court of conscience to assist."

*Id.* at 66, 587 N.E.2d 231 (citations omitted). The court added:

The defendants assumed no risk and the plaintiff gained no advantage. Gross disparity in the values exchanged is an important factor to be considered in determining whether a contract is unconscionable. "[C]ourts [may] avoid enforcement of a bargain that is shown to be unconscionable by reason of gross inadequacy of consideration accompanied by other relevant factors." ... We are satisfied that the disparity of interests in this contract is "so gross that the court cannot resist the inference that it was improperly obtained and is unconscionable."

*Id.* at 69, 587 N.E.2d 231.

In *United Companies Lending Corp. v. Sargeant*, 20 F.Supp.2d 192 (D.Mass.1998), the court considered the doctrine of unconscionability in a relationship between Daisy Sargeant ("Sargeant"), the owner of a triple-decker dwelling in Dorchester, Massachusetts, who, wishing to make improvements to her home, responded to an advertisement in the *Boston Herald* about the availability of loans, and United Companies Lending Corp. ("United"), an entity that made, sold, and serviced loans used for refinancing, and made first lien residential mortgage loans used primarily for debt consolidation, home improvements or major household purchases. *Id.* at 196. United specialized in subprime loans to consumers with higher credit risks than borrowers in the prime market. *Id.*

Sargeant contacted a toll free number and received a mortgage application from a California-based mortgage broker, who referred her to a United mortgage loan originator located in Rhode Island. Sargeant completed a loan application sent to her by United's agent and obtained an adjustable rate loan in the amount of $134,700 with an initial annual percentage rate of 13.556%. *Id.* Sargeant's total closing costs and fees constituted approximately 17% of the total loan amount; $13,461.40 was paid to United as an origination fee or "points." Approximately 12% of the loan proceeds or $15,681 was disbursed for home improvements and 3.6% or $4,910 was used to pay down credit card debt. The balance of the loans proceeds was used to satisfy two prior mortgages. *Id.* at 196–97.

Sargeant fell behind on her payments, and United commenced foreclosure proceedings. Sargeant then filed a complaint with the Consumer Protection and Antitrust Division of the Massachusetts Attorney General's Office. *Id.* at 197. The Attorney General, in response to Sargeant's consumer complaint, filed an action against United in the Massachusetts Superior Court to enjoin United from, among other things, making any mortgage loans in violation of Mass. Gen. Laws Ch. 184, § 17D and 940 C.M.R. § 8.00 *et seq.* *Id.* United then commenced a defendant class action suit against Sargeant seeking a de-

claratory judgment that the regulation that the Attorney General sought to enforce was void and unenforceable and that its loan origination fee or points charged to Sargeant were proper. *Id.* Sargeant counterclaimed, "asking for a declaration that the mortgage transaction was an unfair or deceptive act because it was unconscionable pursuant to 940 C.M.R. § 8.06(6)," [13] and that rescission of the mortgage loan was the appropriate remedy. *Id.*

Both United and Sargeant moved for summary judgment. Before addressing Sargeant's counterclaim, however, the district court considered whether the regulation at issue was consistent with the decisions of the Federal Trade Commission and federal courts interpreting 11 U.S.C. § 45(a)(1) and, if so, whether the regulation was arbitrary, capricious, or manifestly contrary to the state statute. *Id.* at 198. In determining that the regulation was consistent with legislative intent and applicable federal law, the court reviewed the economic circumstances surrounding the enactment of the regulation, including "the abandonment of the inner-city neighborhoods by mainstream lending institutions

during the 1970s and 1980s, the deregulation of the banking industry … [and] … the appreciation of real estate values in Massachusetts, and the rise of secondary mortgage market," which laid the groundwork for "the lending practices that fueled the home improvement and second mortgage lending scams of the 1980s and early 1990s." *Id.* at 202.[14]

Sargeant, in support of her position, argued that the origination fee was above the industry standard, the fees paid at the closing were grossly disproportionate to the value received, the loan violated the lender debt-to-income parameters for a "C" borrower, as her debt to income ratio was 51%, the lender's method of determining compensation for its loan originators encouraged the originator to act in an unconscionable manner and the lender's disclosures in the mortgage transaction did not comply with its policy and state disclosure requirements. *Id.* at 205. In addressing, Sargeant's unconscionability argument, the district court stated the following:

> Unconscionability is a question of law to be assessed at the time the contract was

---

**13.** The regulation provides the following:
> It is an unfair or deceptive practice for a mortgage broker or lender to procure or negotiate for a borrower a mortgage loan with rates or terms which *significantly deviate from industry-wide standards* or which are *otherwise unconscionable.*

20 F.Supp.2d at 198 (quoting 940 C.M.R. § 8.06(6))(emphasis added).

**14.** The court described the "unscrupulous behavior of unregulated mortgage brokers and lenders who engaged in predatory lending practices that included offering high-rate and high-fee loans to borrowers who lacked access to mainstream banks because of redlining practices, had marginal credit histories, and had limited financial sophistication." *Id.* It stated the following:
> The targets of predatory lenders are usually people who have substantial equity in their homes due to rising real estate values or

due to the reduction of purchase money debt, but who are short on cash because of their low or fixed incomes. They may need money to make home repairs or improvements, to pay for necessities such as medical care, or to consolidate household debts. These homeowners generally do not obtain home equity loans primarily for their tax advantages but because borrowing against their homes is the only way that they can obtain the credit they need to make home repairs or to survive periods of economic distress. Those most often affected are minorities, the elderly, and the inner-city and rural poor.

*Id.* at 202 (citing Julia Patterson Forrester, *Mortgaging the American Dream: A Critical Evaluation of the Federal Government's Promotion of Home Equity Financing*, 69 Tul. L.Rev. 373, 387–89 (1994)).

executed by the parties. *See Zapatha v. Dairy Mart, Inc.,* 381 Mass. 284, 291, 408 N.E.2d 1370 (1980). It is a case-specific assessment. "Because there is no clear, all-purpose definition of 'unconscionable,' nor could there be, unconscionability must be determined on a case by case basis, giving particular attention to whether, at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party." *Id.* 381 Mass. at 292–93, 408 N.E.2d 1370 (internal citations omitted). . . .

The principle of unconscionability is addressed in the Uniform Commercial Code, *see* U.C.C. § 2–302, and the Supreme Judicial Court has applied the principles of unconscionability articulated there to "situations outside the ambit of the code." *Waters v. Min Ltd.,* 412 Mass. 64, 67, 587 N.E.2d 231 (1992). Under Massachusetts law, the doctrine of unconscionability recognizes procedural and substantive unconscionability. *See Zapatha,* 381 Mass. at 292–93, 294 n. 13, 408 N.E.2d 1370. Procedural unconscionability evaluates the circumstances under which the contract was executed to determine if it is the product of unfair surprise. Substantive unconscionability evaluates the actual terms of the contract to determine if they are substantively unfair. "If the sum total of the provisions of a contract drive too hard a bargain, a court of conscience will not assist its enforcement." *Waters,* 412 Mass. at 68, 587 N.E.2d 231 (citing *Campbell Soup Co. v. Wentz,* 172 F.2d 80, 84 [3d Cir.1948] ). . . .

\* \* \* \* \* \*

The fact that this conduct constitutes an unfair or deceptive practice, however, does not mean that this conduct was unconscionable.

20 F.Supp.2d at 206–07.

The district court reviewed both substantive and procedural unconscionability. With respect to substantive unconscionability, the court focused on the disparity between the fees and the value Sargeant obtained as well as the violation of debt-to-income parameters. With respect to procedural unconscionability, it focused on the compensation method of the loan originators and the failure to follow disclosure requirements. While awarding the Debtor actual damages of $13,461.40, plus interest, for improper origination fees or points, as well as $4,150, plus interest for improper brokerage fees, and attorney's fees, the court struggled with the issue of unconscionability, refraining from expressing an opinion. Nevertheless, it stated "[a] court sitting in equity . . . is empowered to do complete justice as between the parties." *Id.* at 210. Thus, it granted Sargeant "an opportunity to tender to United within six months the outstanding principal (not interest) due on her loan as of the date of the court's order plus interest at the contract rate from the date of the order, in which case the mortgage would be discharged and the mortgage note satisfied." *Id.*

### 2. Positions of the Parties

#### a. The Debtor

The Debtor argues that "the disparity of interests and oppressive terms of the agreement preclude any suggestion that Defendant Fairbanks, the loan originator, or, indeed, anyone could think that the terms of this transaction were acceptable to an 'honest fair man.' " She points out that she was approached by a door-to-door salesman, that $12,659.40 of the $137,611.01 was for fees and prepaid interest, and that the 15-year loan was "flipped" to a five year loan in less than

three years. Moreover, the Debtor states that she received nothing of value in the refinancing, but her principal increased to $149,150.50, that the monthly payment of $2,005.71, which constituted 98.5% of her income and that of Ranger, was insufficient to amortize the loan, and that a balloon payment was required at the expiration of the term of the loan. In addition, Ranger, in her affidavit, indicated that she and the Debtor were not provided with TILA disclosures.

### b. Fairbanks

Fairbanks argues that, "although an interest rate of 16% may have been above the market rate, such a rate is not in the least bit unusual." Opposition at 9. It adds that the Debtor "did not shop for a loan, and never even attempted to secure a lower interest rate." *Id.* Fairbanks also argues that the Debtor "seems to have been in need of a way of consolidating her loans, and greatly benefitted from the funds she obtained via the loan." *Id.* at 10. Finally, Fairbanks asserts that even though the Debtor's monthly payments constituted the majority of her income the loan was not unconscionable. It concludes that the Debtor "was not coerced, she entered into the loan to pay off other loans, she was assisted by her granddaughter, she was aware of the terms of the note, and she did not shop for any other loans. As such, the loan was not unconscionable." *Id.* at 11.

### 3. Analysis

■ The Court finds that the analysis employed by the district court in *Sargeant* is appropriate in this case. Thus, the first question that must be addressed is any disparity in the value received by the Debtor from ITT compared to the consideration given by the Debtor. With respect to the 1988 loan, although the annual percentage rate was 16.78% and the regular monthly payments were $1,908, the bulk of the loan proceeds, $101,280.73, was used to pay preexisting mortgages and other debt, and $22,602.08 was used to pay Vinyl Distributors. Thus, the Debtor arguably received a benefit from those payments. With respect to the 1991 transaction, however, the Debtor did not receive any additional value. The term of the loan, however, was significantly reduced and the monthly payment increased by almost $100. Despite the increased monthly payment, which consumed virtually all of the Debtor's and Ranger's income, the monthly payment did not amortize the loan, leaving the Debtor responsible for a balloon payment at the expiration of the term of the loan in an amount greater than the original principal balance.

In 1988, the Itemization of the Amount Financed shows that the Debtor had two mortgages on the property; one in the sum of $76,596.86 and the other in the sum of $24,683.87. That secured debt in the total sum of $101,280.73 was replaced by a mortgage in the sum of $137,611.01 in 1988 and by a mortgage in the sum $149,150.50 in 1991. Thus, whatever equity the Debtor may have had in her home was significantly reduced.

With respect to the debt-to-income ratio, although the Court has no evidence of what ITT's parameters were, the Court finds that the ratio present in this case was extraordinary. In its Opposition to the Debtor's Motion for Partial Summary Judgment, Fairbanks stated that the Debtor and "her daughter [sic] were not the only ones making payments on the note, nor were they the only individuals residing at the property secured by the note. Thus, the family had additional funds which are undisclosed." Opposition at 10. Fairbanks referred to (Exhibit "XXX") in support of its factual assertion. As no Exhibit labeled XXX is attached to the Opposition, the Court finds that Fair-

banks's assertion is wholly unsupported by the record. Moreover, even if other family members voluntarily contributed money, they would not be legally responsible for the loan payments. Accordingly, there are no issues of fact about the amount of monthly payments, the balloon and negative amortization features of the loan, and the ratio of the monthly payment amount to the combined monthly incomes of the Debtor and Ranger as the sole source of funds to satisfy the ITT loan. Considering the loan terms, the question is, as the district court in *Sargeant* rhetorically stated, "Do these terms 'drive too hard a bargain?'" 20 F.Supp.2d at 207.

With respect to the procedural unconscionability inquiry, the Court has no evidence that ITT satisfied the disclosure requirements for the 1991 transaction, including providing the Debtor with a notice of her right to rescind the transaction. In the absence of such evidence, the Court finds that the Debtor has satisfied the procedural unconscionability prong of the inquiry.

In sum, the Court finds that the 1991 transaction was unconscionable and takes judicial notice that it and the 1988 transaction satisfy, in all material respects, the

paradigm of predatory lending.[15] In answer to the question, "Do the terms of the 1991 transaction drive too hard a bargain?" the answer is unequivocally, "yes."

In *Waters v. Min Ltd.*, the court framed the question as whether the contract "was such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." 412 Mass. at 66, 587 N.E.2d 231. Again, this Court concludes that the answer is "yes," and that the Debtor would not have entered into the 1991 transaction had she been fully cognizant of its ramifications. More importantly, no fair lender would have accepted a loan requiring virtually 100% of the incomes of the co-obligors to satisfy the monthly payments. Additionally, in this case, there was no allocation of risk based on "superior bargaining power." *Id.* at 68, 587 N.E.2d 231. The Debtor appears to have been powerless and assumed all the risk; ITT assumed no risk. If the Debtor made her monthly payments and the balloon payment, it would greatly benefit from the high interest rate it charged. If the Debtor defaulted, it could foreclose on her home and recoup its money that way— a business outlook Fairbanks appears to

---

15. The Court notes that the Code of Massachusetts Regulations now proscribes the types of lending practices evidenced in the Debtor's transactions with ITT. Applicable to high cost home loans, 209 CMR 32.32, effective March 22, 2001, requires explicit notices warning a mortgagor that he or she may, among other things, lose their home. Moreover, it provides that a mortgage subject to 209 CMR 32.32 may not provide for balloon payments if the loan is for a term of less than seven years or for negative amortization. It also identifies certain prohibited acts and practices including making a high cost home loan, "unless the creditor reasonably believes at the time the loan is consummated that the obligor or the obligors ... will be able to make the scheduled payments to repay the obligation based upon a consideration if their current

and expected income, current obligations, employment status, and other financial resources...." 209 C.M.R. 32.32(5)(a). The regulation also prohibits the payment of a contractor under a home-improvement contract from the proceeds of the mortgage other than by an instrument payable to the consumer or jointly to the consumer and the contractor or through a third party escrow agent.

The regulation also defines certain unfair acts or practices for a creditor engaged in transactions subject to its terms, including financing points, fees or charges and "[c]harging a borrower points and fees in connection with a high cost home loan if the proceeds of the high cost home loan are used to refinance an existing high cost home loan and the last financing was within two years of the current refinancing." *Id.* (6)(b).

share as evidenced by its Contact History Report.

For all the foregoing reasons, the Court finds that the 1991 transaction was unconscionable. The Debtor is entitled to rescind the loan by way of recoupment.

## V. CONCLUSION

In view of the foregoing, the Court shall enter an order granting the Debtor's Motion for Partial Summary Judgment, overruling Fairbanks's Opposition and denying Fairbanks's Cross–Motion for Summary Judgment.

### ORDER

In accordance with the Memorandum dated July 16, 2002, the Court hereby grants the Motion of Pearl Maxwell for Partial Summary Judgment with respect to Counts A, C, D and H of her nine count Complaint, overrules the Opposition of the Defendant, Fairbanks Capital Corporation and denies the Cross–Motion for Summary Judgment of Fairbanks Capital Corporation. The Court shall schedule a trial on the remaining counts of the Debtor's Complaint, as well as a further hearing on damages.