**In re Dennis E. THOMPSON and Pamela A. Thompson, Debtors.**

**No. 05–28262–SVK.**

United States Bankruptcy Court, E.D. Wisconsin.

Sept. 22, 2006.

William H. Green, Milwaukee, WI, for Debtors.

### Memorandum Decision on Debtors' Objection to Claim Number 3 of Litton Loan Servicing[1]

SUSAN V. KELLEY, Bankruptcy Judge.

Is it too much to ask a consumer mortgage lender to provide the debtor with a

---

1. After the Debtors' Objection, Litton Loan Servicing, LP amended Claim No. 3 by filing Claim No. 6. This Decision accordingly concerns Claim No. 3 as amended by Claim No. 6.

clear and unambiguous explanation of the debtor's default prior to foreclosing on the debtor's house? This unfortunate chain of events began in March 2001 when Dennis and Pamela Thompson (the "Debtors") filed their first chapter 13 case. The Debtors' plan was confirmed in June 2001. In September of that year, the mortgage creditor, Provident Bank d/b/a PCFS Financial Services ("Provident"), filed a Motion for Relief from and Annulment of Automatic Stay alleging that the Debtors had failed to make payments from April to September 2001. The Debtors objected to the Motion, and several hearings were held. The Court's minutes from the hearings indicate that the Debtors strenuously denied that they had missed mortgage payments, and appeared with copies of checks to confirm that payments had been timely made. Provident eventually confirmed receipt of several of the alleged missed payments.

On January 8, 2002, at the third hearing on the Motion, Judge Eisenberg disposed of the matter by the entry of a "doomsday order." According to that order, the Debtors were required to pay their current mortgage payments by the fifteenth of the month, and if the Debtors missed a payment from January 2002 through June 2002, the Motion for Relief from Stay would immediately be granted upon Provident's filing of written confirmation of the missed payment. The January 8 minute order is somewhat ambiguous, in that it states that time is of the essence for the February 2002 payment, but that the January payment is due by January 15, 2002. The Debtors stated that they agreed to the doomsday provision because they had no intent of defaulting, had the funds available, and would be making the payments during the doomsday period to Provident's attorneys, given the payment application problems they had experienced with sending the checks to Provident.

On May 15, 2002, one of Provident's attorneys, Charles Leppert, filed an "Affidavit of Default," stating that the Debtors had defaulted on the doomsday order by "failing to make the payments beginning with the payment due on April 15, 2002." The Court signed the Order Granting Relief from Stay on May 20, 2002. The Affidavit and cover letter were dated May 10, 2002, and the cover letter shows that copies of the letter were sent to the Debtors and to their attorney. The Court received its copies of the Affidavit on May 15; apparently the Debtors' attorney received his the same day. The Debtors claim they never received a copy, either from Provident's attorney or the Debtors' attorney. By the time the Debtors' attorney allegedly mailed them a letter concerning the Affidavit of Default, the Order granting Provident's Motion for Relief from Stay already had been entered.

On August 19, 2002, the Debtors' attorneys filed an application for additional fees and expenses. Attached to the application was a billing statement which documents the payments made under the doomsday order. On February 15, 2002, check numbers 1194, 1195, 1199 and 1200 were delivered to Provident's attorneys, representing the January and February mortgage payments.[2] On March 14, 2002, the Debtors' attorneys delivered check numbers 1202 and 1203 to Provident's attorneys, and again, received a receipt. On April 15, 2002, they delivered another mortgage payment to Provident's attorneys, and obtained a receipt for check numbers 1218 and 1219. The billing statement shows that the Debtors' attorneys received the Affidavit of Default on May 15, 2002, and, even though the attorneys had been active-

---

**2.** The Debtors always submitted two checks for each monthly mortgage payment. No allegation was ever made that the January payment, delivered on February 15, was late.

ly involved in delivering the mortgage payments to Gray and End, no action was taken until May 21, 2002, when one of the Debtors' attorneys had a telephone conference with Provident's attorney "regarding bounced checks and Gray & End payments" and drafted a letter to the Debtors regarding this conversation. No telephone call was made to the Debtors concerning the Affidavit of Default or the alleged NSF checks. The Debtors contend they never received their attorney's letter, and a July 29, 2002 entry in the attorneys' billing statement confirms: "Clients claim that they did not receive our letters."

On August 21, 2002, the Debtors changed attorneys. On October 17, 2002, the Court denied the Debtors' Motion to Reconsider the award of additional attorneys' fees to their initial attorneys. On October 24, 2002, the Debtors voluntarily converted their case to Chapter 7. Dennis Thompson did not appear at the § 341 meeting of creditors, and his case was dismissed. Pamela Thompson received a discharge in February 2003. Dennis Thompson received a discharge in his own bankruptcy case in February 2004.

Meanwhile, Provident proceeded with foreclosure on the Debtors' personal residence. A judgment of foreclosure was entered in Provident's favor in December 2002; Wells Fargo Bank Minnesota, National Association as Trustee, was substituted for Provident in April 2005, and a hearing to confirm the sheriff's sale was scheduled for June 6, 2005. On May 13, 2005, the Debtors filed this chapter 13 case, and proposed a plan to pay the arrearage due to Provident. After three meetings of creditors, the Trustee filed a Motion to Dismiss their case; Provident's arrearage claim had been filed in an amount far in excess of what the Debtors' plan could pay. Through their attorney, William Green, the Debtors filed an Objection to the Trustee's Motion to Dismiss, and stated that there was a dispute regarding the amount of the arrearage claim.

A hearing on the Debtors' Objection to the Motion to Dismiss was scheduled for October 27, 2005. On October 18, 2005, the Debtors filed a letter stating that the May 2002 Affidavit of Default signed by Provident's attorney was false. The Debtors attached copies of the front and back of check numbers 1218 and 1219 dated April 15, 2002, showing that the checks had cleared the Debtors' bank on May 7, 2002, over one week before the filing of the Affidavit of Default. The attached bank statement indicates not only that the April checks cleared the Debtors' bank, but also shows that check number 1202 in the amount of $1,000 cleared the Bank on April 17, 2002. Check number 1202 was delivered to Gray and End on March 14, 2002, along with check number 1203. There is no evidence on the bank statement of the status of check number 1203, also part of the March 15, 2002 payment. In their correspondence the Debtors stated that Provident had transferred their mortgage to Litton Loan Servicing, LP ("Litton") who refused to accept their payments and who proceeded with the foreclosure in the face of the Debtors' proof that they had not defaulted on the doomsday order.

The Court set a hearing on the Debtors' correspondence, and in the meantime, the Debtors filed their Objection to Litton's Claim. The Court held a preliminary hearing on the Debtors' correspondence, and scheduled an evidentiary hearing in December 2005 to be held in conjunction with the hearing on the Objection to Litton's Claim. The parties appeared and stated that they were working on resolving the matter, and the Court adjourned the hearing to January 17, 2006. On January 6, 2006, however, the Debtors' attorney filed correspondence withdrawing their

Objection to Litton's claim. In this correspondence, Attorney Green alleged that the Debtors failed to provide any proof of the missing payments, even after providing them with a list of the disputed payments.

The Debtors then filed a letter dated January 16, 2006 regarding the withdrawal of their Objection to Litton's claim. In that letter, the Debtors complained that Attorney Green's withdrawal was filed without the Debtors' knowledge or consent, and contained substantial misrepresentations. The Debtors requested that the Court disregard Attorney Green's letter withdrawing their Objection to Litton's claim. They also requested that the interest and attorneys fees added to their account since 2002 be removed, and that any charges for unnecessary insurance be credited to their account. Attached to this correspondence were copies of five different letters from the Debtors to Provident and Litton questioning the application of payments to their account, including the checks paid in the doomsday period. The letters are dated from October 2004 through January 2005. The letters to Litton and Provident reference telephone calls and other communications with Litton and its attorneys over the prior two and one-half year period, and attach copies of the canceled checks from the Debtors to Provident. The only responses by Litton were a February 8, 2005 acknowledgment of the Debtors' "recent inquiry," and a February 14, 2005 letter asserting that the only checks that were not accounted for were checks 1218 and 1219 (the April 15, 2002 checks). The Debtors responded in an undated letter, disputing Litton's assertions that the only checks unaccounted for were 1218 and 1219, and requesting that Litton account for the payments made in the doomsday period. Apparently Litton never responded to this letter. The January 16, 2006 letter also attached copies of "proof of insurance" letters and certificates, showing that the Debtors had continuously insured the property. Although the Debtors had provided this evidence to Litton, the account statements and proof of claim filed by Litton continued to show charges for insurance placed by Litton. The Court scheduled a hearing on the Debtor's correspondence concerning Attorney Green's withdrawal of the Objection to Litton's claim.

Litton's attorneys filed a letter responding to the various issues raised by the Debtors, in an effort to clear up the confusion. Among other things, the letter addressed the escrow errors (including crediting refunds due to the unnecessary homeowner's insurance), the NSF checks, evidence of the property's value, and a payment history which indicates that the Debtors had made only fifteen out of the 61 monthly mortgage payments (and eight of them were returned NSF). However, the accounting attached to this letter was based on payment application dates rather than actual payments made by the Debtors. For example, the letter states that the payment application on March 8, 2002 (2 payments) and April 16, 2002 (1 payment) were reversed as NSF, not that the March or April payment were returned NSF. A cursory comparison of the Debtors' canceled checks to the alleged NSF payment application dates establishes that Litton's recitation of the number of NSF payments is erroneous.

Attorney Green was permitted to withdraw from the Debtors' case, and the Debtors have since been representing themselves. A hearing on their Objection to Litton's claim was held on June 27, 2006. A Litton bankruptcy research specialist testified that an audit showed that the Debtors had indeed made payments that were never credited to their account. Specifically, the Litton witness admitted that the April payments (check numbers 1218 and 1219) were not returned NSF,

and that check number 1202 in the amount of $1,000, was never credited to the Debtors' account. (This check could not have been returned NSF as the Debtors produced both sides of the check and a copy of the bank statement showing the payment of the check.) According to Litton's representative, the problem is that Litton did not originate the loan, and it has been re-audited from Provident. Litton filed an Amended claim on June 30, 2006 giving credit for the alleged NSF payments, and has waived late charges and attorneys fees that had been charged to the account. However, since Litton has refused to accept payments from the Debtors when the loan went into foreclosure, the resulting claim remains in excess of $90,000. The Debtors requested that this claim should be reduced further, to compensate them for the damages caused by Provident's failure to properly credit their account.

■ From what had been presented in June 2006, it appeared that Provident's misapplication of the Debtors' April 2002 payment precipitated the May 15, 2002 Affidavit of Default filed by Provident's attorney. In fact, the payment due on April 15, 2002 had been delivered to Provident's attorney, and the two checks that made up that payment had cleared the Debtors' bank (and had not been returned NSF as was alleged) on May 7, 2002. The Debtors had provided not only copies of the canceled checks and bank statement (on at least two occasions), but also a copy of the receipt Provident's attorneys gave their first bankruptcy attorneys when they delivered the April 2002 payment. Litton acknowledged in February 2005 that this payment had not been accounted for. Failure to accurately record this payment was solely Provident's error. "Creditors, who are in control of accounts information,

are expected to communicate with their attorneys and provide them with accurate information on which the lawyers can rely in advocating the creditor's position, and they are also required to promptly account for debtors' payments or at least timely respond to debtors' questions regarding their account." *In re Kilgore*, 253 B.R. 179, 191 (Bankr.D.S.C.2000).

■ Bankruptcy Rule 9011 requires that attorneys make accurate and factual representations to the court. Fed. R. Bankr.P. 9011(b)(3). "The primary purpose of [Rule 9011] is to deter future abuse of the judicial process." *Kilgore*, 253 B.R. at 192; *see also Brandt v. Schal Assocs., Inc.*, 960 F.2d 640, 646 (7th Cir.1992) ("[D]eterrence may well include the payment of expenses and attorneys' fees generated as a result of the filing of abusive litigation. Case law acknowledges compensation as another important objective and purpose for Rule 11").[3] Rule 9011(c) permits the court to award sanctions against a violator of this rule. Further, "[s]anctions may be imposed against the individual who signed the pleading or against the client represented by the signer." *In re Robinson*, 198 B.R. 1017, 1023 (Bankr.N.D.Ga.1996) (footnote omitted).

The *Kilgore* court followed this rule. After a sophisticated creditor gave its attorney false information regarding the debtors' "missing" payment, the attorney obtained an Order for Relief from Stay and initiated state court foreclosure proceedings. *Kilgore*, 253 B.R. at 183–184. The court found that the creditor violated Rule 9011, even though it never signed any documents, by misrepresenting the debtors' account history and failing to correct the resulting error. *Id.* at 188. In awarding $3,000 in sanctions against the creditor

---

**3.** Since Federal Rule of Civil Procedure 11 is analogous to Bankruptcy Rule 9011, bankruptcy courts look to Rule 11 caselaw in interpreting Rule 9011. *See In re Alberto*, 119 B.R. 985, 992 (Bankr.N.D.Ill.1990).

in favor of the debtors, the court noted: "[the creditor's] improper conduct resulted in significant consequences on Debtors, distorted the procedures relied upon by the Court, and caused a waste of judicial time and resources." *Id.* at 193.

█ As was the case in *Kilgore,* it appeared that Provident violated Rule 9011 by making a false representation to its attorney, causing the attorney to file an erroneous Affidavit of Default. Further, it was quite clear that the Debtors made numerous attempts to correct the error, which led to the foreclosure of their home, but to no avail. Under Rule 9011(c), this Court has the authority to impose sanctions against a creditor seeking to enforce a faulty affidavit of default. However, the procedural requirements under that rule demand that the Court, if on its own initiative, issue an Order to Show Cause as to why sanctions should not be imposed, and allow the offending party time to respond. Fed. R. Bankr.P. 9011(c)(1)(B); *Johnson v. Waddell & Reed, Inc.,* 74 F.3d 147, 151 (7th Cir.1996) ("Rule 11 was specifically and clearly amended to add formality to the procedure by which a district court could impose sanctions on its own initiative. Thus, a *sua sponte* action by the district court concerning the imposition of sanctions must include notice and an opportunity to respond.").

Accordingly, on July 25, 2006, the Court issued an Order to Show Cause as to why Litton should not be sanctioned under Rule 9011. The Order also advised Litton of the Court's concerns that Litton had violated the Real Estate Settlement Procedures Act (RESPA) by its failure to properly credit the Debtors' payments. A hearing was scheduled for August 25, 2006.

Meanwhile, on August 9, 2006, Litton filed a Motion for Relief from Stay alleging that the Debtors had failed to make any mortgage payments from June 2005 through August 2006. The certificate of service shows that the Debtors were sent a copy of the Motion and Notice of Motion by first class mail, and given 15 days to object. No objection was filed.

At the hearing on August 25, 2006, Litton introduced evidence for the first time that the Affidavit of Default was not based on check numbers 1218 and 1219 (the April 2002 checks) but rather was based on check numbers 1195 and 1200 which were dated January 4, 2002 and February 15, 2002, respectively. In prior proceedings, the Debtors had submitted copies of the front and back of those checks showing that they had cleared the Debtors' bank. Litton introduced a witness from Wauwatosa Savings Bank, the Debtors' bank, who presented copies of the front and back of those same checks showing that they had been returned NSF. The witness testified that the checks had initially been accepted for payment, and then returned NSF. In response to the Court's question as to how the Debtors could have obtained a copy of the checks that appeared to have cleared, the witness stated that the Debtors should have been given both copies of the checks, including the ones stamped NSF, but that a clerical error could have resulted in the Debtors' receipt of the copies that were made before they were returned NSF. The account history introduced by the banker corroborated that checks 1195 and 1200 did not clear the bank. The Debtors could not produce copies of their bank statements showing anything different, but the Debtors continued to dispute that they bounced these checks. The Court invited the Debtors to submit additional evidence that the checks were not returned NSF (such as a copy of the bank statement), but in the month after the hearing, nothing was provided.

As of August 25, 2006, then, it appears that Litton's Affidavit of Default was correct in that the Debtors had defaulted by

presenting NSF checks during the "doomsday period." It is more than regrettable that the Affidavit of Default ambiguously refers to the Debtors' default as "failing to make the payments beginning with the payment due on April 15, 2002," suggesting that the problem was with checks 1218 and 1219 submitted on April 15, when in fact the NSF checks were 1195 and 1200, which were submitted in February. If the checks were returned NSF in February, why did Litton wait until May to instruct its counsel to file the Affidavit of Default? After the receipt of the checks in February, Litton continued to accept the Debtors' payments, and Litton admitted in June 2006 that check 1202 had been received and cashed by Litton in the doomsday period, but never credited to the Debtors' account. Compounding the confusion, despite their repeated requests, Litton never explained to the Debtors which checks caused the problem. For example, Litton's correspondence to the Debtors indicates that only checks 1218 and 1219 are not accounted for. When the Debtors disputed Litton's accounting—including by sending their copies of checks 1195 and 1200 which appeared to have cleared the bank—Litton failed to respond. Litton's attorney represented at an early hearing that it appeared the Debtors were correct, and that the records concerning NSF payments were in error. The Court's comparison of the alleged NSF payment applications to the bank statement produced by the Debtor confirms that Litton's NSF records were erroneous. At the June 2006 hearing, Litton's own representative did not accurately diagnose that the problem checks were 1195 and 1200, not checks 1218 and 1219, and she admitted that check 1202 was never applied to the Debtors' account. Litton's bankruptcy research specialist never explained that the Debtors' default was caused by the NSF status of checks 1195 and 1200; if she had, perhaps the Debtors could have presented something in rebuttal. Instead, she admitted that checks 1218 and 1219 did not bounce, and testified that in order to resolve the errors in the accounting, Litton was willing to waive all late charges and attorneys fees as part of its claim, to credit the $1,000 from check number 1202 that had never been credited, and to credit the Debtors' account with insurance premiums if the Debtors could provide proof that their property had been insured during 2004 and 2005. As of the August 25, 2006 show cause hearing, Litton's posture was more defensive. Litton challenged the Court's jurisdiction to consider relief under RESPA, argued that the Court was bound by principles of res judicata not to reconsider the propriety of the Affidavit of Default, and claimed that the Debtors were guilty of laches and failed to mitigate their damages.

The Debtors continue to complain that Litton has not accurately credited their account. They also accuse Litton of not providing them notice and copies of pleadings that were filed in their bankruptcy case. For example, they stated that they never received a copy of the original Affidavit of Default in May 2002. They did not receive a copy of the subpoena that Litton served to obtain the bank records regarding checks 1195 and 1200. And they testified that they never received copies of the Notice of Motion and Motion for Relief from Stay that Litton filed on August 9, 2006. On the other hand, they did receive multiple copies of Litton's "Notice of Default and Intent to Accelerate" in February 2006. This notice clearly violated the automatic stay, and is further evidence of Litton's sloppy practices in its treatment of the Debtors' account.

 In addition to being bound by Rule 9011 and the provisions of the Bankruptcy Code, the Real Estate Settlement Procedures Act (RESPA) governs Litton's

dealings with the Debtors. "RESPA's principle purpose is to protect home buyers from material non-disclosures in settlement statements and abusive practices in the settlement process. RESPA applies not only to the actual settlement process, however, but also to the servicing of federally regulated mortgage loans." *MorEquity, Inc. v. Naeem*, 118 F.Supp.2d 885, 900 (N.D.Ill.2000) (internal citations omitted). Federally regulated mortgage loans include any loans secured by a first or subordinate lien on residential real property. *Id.*; 12 U.S.C. § 2602(1)(A).

█ Section 2605 of the Act imposes standards on mortgage lenders, and requires that certain disclosures be made and certain procedures be followed. A borrower triggers the protections in § 2605 when that person submits a "qualified written request," which is a written correspondence that "includes, or otherwise enables the servicer to identify, the name and account of the borrower[, and] includes a statement of the reasons for the belief ... that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B). At the very least, the statute requires a servicer to provide written acknowledgment of any qualified written request within 20 days. 12 U.S.C. § 2605(e)(1)(A). Section 2605(e)(2) then requires a mortgage lender to take one of three actions:

Not later than 60 days ... after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall—

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction ...

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; ... or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer....

If a lender fails to comply with this section, the statute imposes civil liability for costs, attorneys fees, actual damages, and statutory damages not to exceed $1,000. *Id.* § 2605(f)(1), (3). The actual damages allowable under RESPA include recovery for emotional distress. *Johnstone v. Bank of America, N.A.*, 173 F.Supp.2d 809, 815–816 (N.D.Ill.2001).

█ The copies of the letters that the Debtors submitted with their January 16, 2006 filing show that Litton did not comply with the provisions of RESPA. Litton acknowledged only one of the five written requests as required by § 2605(e)(1)(A), and it did not comply with subsection (2). Until long after the 60–day time limit had expired, Litton failed to (A) correct the account, (B) provide a written explanation why it believed the account was correct, or (C) provide an explanation why the information requested could not be obtained. The Debtors never received any meaningful action on their requests (e.g., an explanation that the Affidavit of Default was based on checks 1195 and 1200; the crediting of check number 1202; the correction of the escrow charges for insurance that

the Debtors had proven was in effect the whole time) until the hearing held August 25, 2006. This is clearly in violation of the time requirements in § 2605(e), and as a result, Litton is liable under RESPA for the Debtors' costs, attorneys fees, and actual damages.

■ Does Litton's failure to respond to the Debtors' requests demonstrate a pattern or practice entitling the Debtors to statutory damages up to $1,000? This is a close question. However, based upon all the evidence presented in this case, it does not appear that Litton's discrete violations in this case constitute such a pattern or industry-wide practice. *See Maxwell v. Fairbanks Capital Corp. (In re Maxwell),* 281 B.R. 101, 123 (Bankr.D.Mass.2002) (two failures to respond did not constitute a "pattern or practice"); *In re Tomasevic,* 273 B.R. 682 (Bankr.M.D.Fla.2002) (one failure to respond did not constitute a "pattern or practice"); *but see Ploog v. HomeSide Lending, Inc.,* 209 F.Supp.2d 863, 869 (N.D.Ill.2002) (failure to respond to five qualified written requests constituted "pattern or practice").

■ The Debtors' allegations are in the nature of a recoupment objection to Litton's proof of claim. "Recoupment is an equitable defense which enables a defendant to reduce liability on a plaintiff's claim by asserting an obligation of the plaintiff which arose out of the same transaction." *Brown v. Gen. Motors Corp.,* 152 B.R. 935, 938 (W.D.Wis.1993). If it is warranted, a bankruptcy court may reduce the amount of a filed proof of claim based on recoupment. *See, e.g., Maxwell,* 281 B.R. at 120 (debtor entitled to reduce or satisfy claims creditor may have from damages under FDCPA); *Andrews v. Fleet Real Estate Funding Corp. (In re Andrews),* 78 B.R. 78, 84–85 (Bankr. E.D.Pa.1987) (debtor entitled to reduce mortgage creditor's claim for violations of state consumer protection laws); *Ralls v. Bank of New York (In re Ralls),* 230 B.R. 508, 522–523 (Bankr.E.D.Pa.1999) (debtor entitled to reduce creditor's claim by amount of statutory damages due as a result of TILA violation).

■ Litton argues that RESPA cannot be used to reduce the amount of a claim via recoupment, but must instead be brought as an independent lawsuit for affirmative relief in this Court or the district court. However, "actions by way of recoupment have been recognized by court decision in a broad variety of federal statutory settings including the bankruptcy code, the internal revenue code, and—prior to Congressional clarification—in regard to TILA." *Integra Bank/Pittsburgh v. Freeman,* 839 F.Supp. 326, 330 n. 6 (E.D.Pa.1993) (internal citations omitted). Even though RESPA does not explicitly authorize actions by way of recoupment, the Debtors are not foreclosed from using the statute defensively against Litton's claim. *Harvey v. EMC Mortgage Corp. (In re Harvey),* 2003 WL 21460063, at *7–8 (Bankr.E.D.Pa. June 9, 2003). Here, the Debtors' claims against Litton all arose out of the mortgage loan, satisfying the "same transaction" requirement. Thus, the Debtors are entitled to recoup damages as a result of Litton's conduct.

In considering the damages for Litton's conduct, the Court considers that Litton's Affidavit of Default ambiguously referred to the April payment, and Litton never explained that the January payment was the cause of the default. Despite repeated requests, Litton did not provide the Debtors with what should have been a fairly simple explanation of the application of payments to their account, although the task may have been complicated by the transfer of the loan from Provident. Also, it appears that Litton or its predecessor provided the Debtor with misinformation concerning the NSF checks, and never

credited check number 1202 which was tendered to Litton's attorneys in March 2002. Finally, Litton's records were apparently so inadequate that Litton sent the Debtors a notice of default and acceleration in violation of the stay in February 2006. On the other hand, the Debtors have not made more than a handful of mortgage payments since 2002. They testified that Litton refused to accept their payments, but the Debtors did not "bank" any of the payments to tender to Litton when the accounting problem was resolved. Also, this entire dispute could conceivably have been avoided if the Debtors had timely objected to the Affidavit of Default in the first place. Some of the blame for their problems must be shouldered by the Debtors and the attorneys who represented them in the bankruptcy and foreclosure cases. The Debtors testified very sincerely that they never received the Affidavit of Default from Gray and End, and they never received the May 21, 2002 letter concerning the Affidavit from their own attorneys. They also seem genuine when they state that they did not bounce checks for their mortgage payments. But the evidence suggests otherwise. The Debtors' own bank officer testified that checks 1195 and 1200 were returned NSF, and when the Debtors were given an opportunity to provide the Court with evidence to show that their copy of these checks (which are not stamped NSF and appear to have cleared the Bank) was in fact the correct state of affairs, they failed to do so.

Weighing the evidence and credibility of the parties, the court is convinced that Litton violated RESPA by failing to (1) notify the Debtors in response to their inquiries exactly which payments were at issue, and (2) properly credit their account with the March and April 2002 payments. The Debtors should not have been required to file another bankruptcy proceeding, object to Litton's claim, and appear at numerous hearings, just to learn the correct status of their mortgage account. Litton should not have violated the automatic stay by sending the Debtors a default and acceleration notice in the midst of this dispute about Litton's claim. Although the Debtors would have been better served by raising these objections earlier, the doctrine of recoupment is available to them to reduce Litton's claim in this case.

For the above reasons, a separate Order will be entered sustaining the Debtors' Objection to Litton's claim, and reducing Litton's claim by (1) $1,000 plus any accrued interest on that amount from March 14, 2002 when check number 2002 was tendered; (2) all escrow charges for insurance premiums, since the Debtors have shown that the property has been continuously insured; (3) any and all late charges starting with the payment due on April 15, 2002 to the date of the Order; (4) any and all attorneys' fees and costs from April 15, 2002 to the date of the Order; and (5) the sum of $7,500 to account for the attorneys' fees, costs and damages incurred by the Debtors in attempting to resolve this issue.